**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

| | |
|---|---|
| THEODORE WALTER JONES, | Case No. 5:18-cv-05698-BLF |
| Petitioner, | |
| | **ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY; DENYING REQUEST FOR AN EVIDENTIARY HEARING AND DISCOVERY; DIRECTIONS TO CLERK** |
| v. | |
| JOSEPH W. MOSS, Chief of Delano Community Correctional Facility, | |
| Respondent. | [Re: ECF 1, 28] |

Petitioner Theodore Walter Jones ("Petitioner") petitioned for a writ of habeas corpus under 28 U.S.C. § 2254, challenging his state conviction. Pet. for Writ of Habeas Corpus ("Petition" or "Pet."), ECF 1. Chief of Delano Community Correctional Facility Joseph W. Moss ("Respondent") filed an answer on the merits. Mem. P. & A. in Supp. of Answer ("Response" or "Resp."), ECF 21-1. Petitioner filed a traverse. Pet'r's Traverse to Resp't's Ans. ("Traverse" or "Trav."), ECF 26. Petitioner also requested an evidentiary hearing or new discovery on the matter. Req. for an Evid. Hr'g or, in the Alternative, Disc. ("Request" or "Req."), ECF 28. Respondents opposed the Request, and Petitioner replied. Opp'n to Req. ("Opposition" or "Opp."), ECF 29; Opp'n to Req. ("Reply"), ECF 32. For the reasons set forth below, both the Petition and the Request are DENIED.

## I. BACKGROUND

On October 24, 2012, a jury in Alameda County Superior Court found Petitioner guilty of voluntary manslaughter and possession of a firearm by a felon. Pet. 2–3. On January 7, 2010, the Trial Court sentenced Petitioner to 15 years and 8 months, and he is currently confined at Delano Community Correctional Facility. Pet. 3.

1    Petitioner filed a direct appeal (*People v. Jones*, Court of Appeal Case No. A137714) and a

2    petition for writ of habeas corpus (*People v. Jones*, Court of Appeal Case No. A141861) with the

3    Court of Appeal of the State of California.  Pet. 3, 4.  Petitioner appealed his convictions asserting

4    ten claims, including multiple sub-claims of ineffective assistance of counsel.[1]  Resp. Exh. 4, ECF

5    21–17.  On November 18, 2016, the California Court of Appeal, First Appellate District ("State

6    Appellate Court") affirmed the judgment of convictions and denied petition for writ of habeas

7    corpus.[2]  Pet. 4, 5 (citing *People v. Jones*, Cal. Court of Appeal No. A137714, available at Pet.

8    Exh. 1, ECF 1-1).  The California Supreme Court denied review on February 15, 2017.  Pet. 6–7;

9    *id.*, Exh. 2, *People v. Jones*, Cal. Case No. S239112.  On October 2, 2017, the Supreme Court of

10   the United States denied the petition.  Pet., Exh. 3; *Jones v. California*, U.S. Case No. 19-9046.

11   Petitioner filed the instant habeas petition on September 18, 2018, raising the claims from

12   his direct review and the State Appellate Court habeas petition.  *See generally* Pet.

## II.    STATEMENT OF FACTS

14   The following background facts describing the crime and evidence presented at trial are

15   from the opinion of the State Appellate Court on direct appeal[3]:

### A.    Trial Testimony

The charges against defendant arose from an incident that occurred on the
evening of September 8, 2010, near a taco food truck located in a parking lot in
East Oakland.  Defendant and the victim D'Mario Anderson engaged in an
altercation during which defendant disarmed the victim of his firearm.  Defendant
then fired several shots at the victim, fatally wounding him.  Forensic pathologist
John Iocco, M.D., performed an autopsy on the victim.  According to Iocco's
report, the victim sustained four wounds from three shots, which together caused
the victim's death.  Specifically, the victim was wounded by a bullet striking and
entering the front shoulder area and exiting the armpit; a bullet striking the front
right parietal scalp; and a bullet striking the front mastoid area near the ear and
entering the victim's brain.  Iocco believed the bullets striking the victim's shoulder
and scalp areas were non-fatal, and the bullet striking the mastoid area was fatal.

---

[1] The Petitioner, here, separates some claims that were combined in his filings with the State
Appellate Court.  *See* Resp. Exh. 4, at i–iv.

[2] Once the State Appellate Court affirmed Petitioner's conviction, it summarily denied his petition
for writ of habeas corpus.  Pet. Exh. 1, at 2, ECF 1-1.

[3] The State Appellate Court's finding of facts is presumed to be correct.  28 U.S.C. § 2254(e)(1);
*Hernandez v. Small*, 282 F.3d 1132, 1135 n.1 (9th Cir. 2002); *Brown v. Horell*, 644 F.3d 969, 972
(9th Cir. 2011).

However, Iocco was not able to determine the order in which the bullets struck the victim.

At a jury trial held two years after the incident, the prosecution called as percipient witnesses to the shooting, the victim's companions and friends Cornelius Hawkins (Hawkins) and Victor Wilkins (Wilkins); defendant's companion and then girlfriend Brandy Davis (Davis); and three taco food truck workers, Luis Fernando Rivas-Castanellos (Rivas), and brothers Jorge Estrada and Eleazar Estrada. [FN4] Defendant testified in his own behalf.

> FN4. Because the Estrada brothers share the same last name, we will hereafter refer to them by their first names, for clarity and convenience, and intend no disrespect.

The testimony given during the trial revealed that on the evening of the shooting, two groups were present at the taco food truck awaiting preparation of their food orders: (1) defendant, Davis, defendant's then best friend Fred Thompkins (Thompkins), and Thompkins' girlfriend Monique Broussard (Broussard); and (2) the victim, Hawkins, and Wilkins. There is no material dispute concerning the circumstances that gave rise to defendant's possession of the victim's firearm. While both groups waited to receive their orders at the taco food truck, Thompkins and Hawkins engaged in a fistfight. As the men fought, the victim drew a gun and defendant grabbed the victim in a bear hug to prevent him from using the gun. During the struggle, the gun was fired and defendant sustained a through-and-through gunshot wound in his leg. After this gunshot, defendant and the victim continued to struggle for the gun, and defendant ultimately disarmed the victim. What occurred after the victim was disarmed was hotly disputed by the parties at trial.

The prosecution's theory was that after the victim was disarmed by defendant, the victim tried to run away. Defendant, now armed with the victim's gun, pursued the victim, firing several shots at him. One bullet struck the victim in the shoulder, and another bullet struck the victim in the scalp, causing him to fall to the ground on his stomach. While the victim was prone on the ground and bleeding from two gunshot wounds, defendant paused for about four seconds. At this point, defendant's best friend Thompkins said something to him, and defendant readjusted the gun's position, took a step or two, and shot the victim from a distance of about six or seven inches. This last gunshot, which entered the victim's mastoid area behind his ear, killed the victim, "finishing him off." Defendant took the victim's gun with him when he left the scene.

The defense, in turn, contended that while the defendant held the victim in a bear hug during the struggle for the victim's gun, defendant felt an unidentified object in the victim's waistband. After the victim was disarmed he ran, and as he ran, he turned back towards defendant. Defendant observed the victim reaching for his waistband and reasonably believed the victim had a second loaded gun based on what he had felt earlier as he held the victim in a bear hug. Believing there was no time to retreat, defendant pursued the fleeing victim, firing the victim's gun and striking the victim in the scalp and mastoid area. Falling to the ground, the victim slid and twisted as a result of those gunshots. The victim came to rest on his back and facing up. Defendant saw the victim's arms move and believed the victim was still reaching for a loaded gun. In response to the victim's movement, defendant fired a final gunshot into the shoulder area of the victim. According to the defense, when defendant fired the final gunshot into the victim, the victim was already dead from the mastoid wound. At the time of the final gunshot, defendant was standing alone.

Several Oakland police officers, medical personnel, and a member of the coroner's office responded to the scene of the shooting after the receipt of a 911 call, which was played for the jury. The victim was found lying on his back, with visible gunshot wounds to his head and shoulder. The victim was declared dead at the scene.

The investigating police officers found eight .22 caliber expended shell casings, fired from the same gun, in a pattern suggesting a firearm was fired multiple times in an arc from the taco food truck to the victim's prone body. There were no visible firearms on or near the victim. However, when a member of the coroner's office rolled the victim's body over, a gun fell out of the back of the victim's clothing from an area near the waistband of his pants. The victim was the owner of the gun, which was loaded but with no round in the chamber. After testing, it was determined the gun had not fired the shell casings found at the scene or the bullet recovered from the victim's body.

Following the shooting, defendant fled in a car driven by Broussard, and accompanied by Thompkins and Davis. When he entered the car, defendant dropped the victim's gun on the floor of the car where he was seated. Defendant said he had been shot and he acted in self-defense. Defendant told Thompkins to take him to a hospital. Thompkins told Broussard to drive to a hospital in Tracy. There was no discussion about whether to go to a nearby hospital in Oakland. During the one-hour drive to the Tracy hospital, defendant did not attempt to call the police because he was scared and wanted to distance himself from the situation.

When they arrived at the hospital, defendant and Davis got out of the car and went into the emergency room. Thompkins and Broussard drove away. Defendant's main focus "was getting to the hospital," and once he got there, he left the gun in the car and there was no further discussion about the gun. Defendant testified he never asked anyone to turn over the gun to the authorities because "[w]e went straight to the hospital, went in, and left the gun in the car." He last saw the gun "in [Thompkins'] car." Defendant also testified that before he exited the car, there was "a preexisting plan" that he would not tell the truth about the shooting if questioned by the hospital staff in the hope of avoiding detection. Thompkins would pick up defendant and Davis after defendant was treated at the hospital.

While defendant was being treated at the hospital, Tracy Police Department Officers Makeba Moore and Jared Trine were dispatched to the hospital to investigate a report of someone being treated for a gunshot wound in the emergency room. Officer Moore recorded her discussion with defendant regarding how he was shot and injured his hand. The recording was played for the jury. [FN 5] Officer Trine interviewed Davis concerning how defendant was shot. Davis indicated she had been with defendant and that he had been shot in Tracy. Officer Moore determined the shooting incident had not occurred in Tracy and asked her dispatch to conduct a check of defendant's name, which revealed that he lived in Oakland. Officer Moore also learned that the Oakland Police Department had reported a shooting in Oakland. Because defendant matched the description of the person sought in Oakland, Moore arrested defendant and he and Davis were transported to the Oakland police department.

FN5. At trial, defendant did not recall what he said to the hospital staff or the Tracy police officer, when questioned, about how he was shot. He knew he had lied to the Tracy police officer because the officer "caught on to it," and detained him. Defendant had lied to hospital staff and the Tracy police officer because he was "just trying to distance" himself from the

4

situation, he was thinking about his children, and he wanted to get home to them. Once defendant was detained, he cooperated with the authorities.

B.    Charges, Deliberations, and Verdicts

The jury was asked to consider the charges of murder in the first and second degree, and the lesser offense of voluntary manslaughter (unreasonable self-defense, heat of passion, or sudden quarrel), together with a related sentence enhancement of personal use of a firearm, and a charge of possession of a firearm by a felon. The jury was also instructed to consider defendant's claims of lawful self-defense and defense of others and unreasonable self-defense and defense of others. During deliberations, the jury requested read backs of portions of Dr. Iocco's direct and cross-examination testimony, and defendant's direct and cross-examination testimony. The jury also requested a device to listen to the tape of the 911 call. After less than two days of deliberations, the jury acquitted defendant of murder in the first and second degree, and found him guilty of voluntary manslaughter, with a true finding that he personally used a firearm during the commission of the offense, and guilty of possession of a firearm by a felon.

Pet. Exh. 1, at 2–6, ECF 1-1 (internal citations omitted).

## III.    LEGAL STANDARD

This Court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a); *Rose v. Hodges*, 423 U.S. 19, 21 (1975). The writ may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412–13 (2000). The only definitive source of clearly established federal law under 28 U.S.C. § 2254(d) is in the holdings (as opposed to the dicta) of the Supreme Court as of the time of the state court decision. *Williams*, 529 U.S. at 412; *Brewer v. Hall*, 378 F.3d 952, 955 (9th Cir. 2004). While circuit law may be "persuasive

1   authority" for purposes of determining whether a state court decision is an unreasonable

2   application of Supreme Court precedent, only the Supreme Court's holdings are binding on the

3   state courts and only those holdings need be "reasonably" applied.  *Clark v. Murphy*, 331 F.3d

4   1062, 1069 (9th Cir.), *overruled on other grounds by Lockyer v. Andrade*, 538 U.S. 63 (2003).  A

5   state court need not recognize the controlling cases, "so long as neither the reasoning nor the result

6   of the state-court decision contradicts them."  *Early v. Packer*, 537 U.S. 3, 8 (2002).

7          "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if

8   the state court identifies the correct governing legal principle from [the Supreme Court's]

9   decisions but unreasonably applies that principle to the facts of the prisoner's case."  Williams,

10  529 U.S. at 413.  But "a federal habeas court may not issue the writ [under § 2254(d)(1)] simply

11  because that court concludes in its independent judgment that the relevant state-court decision

12  applied clearly established federal law erroneously or incorrectly."  *Id.* at 411.  A federal habeas

13  court making the "unreasonable application" inquiry should ask whether the state court's

14  application of clearly established federal law was "objectively unreasonable."  *Id.* at 409.  The

15  federal habeas court must presume correct any determination of a factual issue made by a state

16  court unless the petitioner rebuts the presumption of correctness by clear and convincing evidence.

17  28 U.S.C. § 2254(e)(1); *Kirkpatrick v. Chappell*, 926 F.3d 1157, 1170 (9th Cir. 2019).

18         "The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 28 U.S.C. § 2254,

19  imposes a highly deferential standard for evaluating state-court rulings and demands that state-

20  court decisions be given the benefit of the doubt."  *Hardy v. Cross*, 565 U.S. 65, 66 (2011) (per

21  curiam) (citation omitted); *see also Harrington v. Richter*, 562 U.S. 86, 96-100 (2011); *Felkner v.*

22  *Jackson*, 562 U.S. 594, 598 (2011) (per curiam).  In other words, the Supreme Court has

23  vigorously and repeatedly affirmed that under AEDPA, a federal habeas court must give a

24  heightened level of deference to state court decisions.  With these principles in mind regarding the

25  standard and limited scope of review in which this Court may engage in federal habeas

26  proceedings, the Court addresses Petitioner's claims.

27  **IV.    DISCUSSION**

28         Petitioner asserts the following twelve grounds for relief, several of which include

6

ineffective counsel claims: (1) insufficient evidence to support the convictions; (2) prosecutorial misconduct for not disclosing material evidence; (3) trial court error in denying motion to dismiss the case; (4) ineffective counsel for failing to introduce certain evidence; (5) ineffective counsel for not calling Thompkins as a defense witness; (6) improper or inadequate curative jury instructions; (7) trial court error by excluding evidence of prior violent act; (8) trial court error by excluding excited statements; (9) improper witness testimony under *Doyle v. Ohio*, 426 U.S. 610 (1976); (10) prosecutorial misconduct during closing argument; (11) general ineffective counsel, including representation for sentencing; (12) cumulative error. *See* Pet. 21–83.

As noted, the California Supreme Court summarily denied Petitioner's request for review. Pet., Exh. 3, ECF 1-1. The State Appellate Court, in its reasoned opinion on direct review, addressed the claims in this Petition. *See generally* Pet. Exh. 1. It was also the highest court to have reviewed those claims raised in a reasoned decision; therefore, this Court reviews the State Appellate Court's reasoned opinion and presumes that its factual findings are correct. *See Ylst v. Nunnemaker*, 501 U.S. 797, 803–04 (1991); *Barker v. Fleming*, 423 F.3d 1085, 1091–92 (9th Cir. 2005); *see also* 28 U.S.C. § 2254(e)(1); *Brown v. Horell*, 644 F.3d 969, 978 (9th Cir. 2011).

The Court discusses each of Petitioner's claims in turn, except the ineffective counsel claims, which are discussed together.

**A.  Sufficiency of the Evidence (Claim 1)**

Petitioner first claims that there was insufficient evidence to establish beyond a reasonable doubt that he "harbored a conscious disregard for life." Pet. 21. Petitioner argues that, consequently, the evidence establishes justifiable homicide because he "reasonably, objectively and actually believed that [the Victim] presented an imminent danger to him and his friend." Pet. 22. Additionally, Petitioner contends that because he possessed the weapon only when he needed it for defense, the evidence does not support his conviction for possession of a firearm by a felon. Pet. 23–24. The State Appellate Court rejected all aspects of this claim on direct appeal:

> Defendant challenges his convictions for voluntary manslaughter and possession of a firearm by a felon, arguing that the evidence was insufficient to prove that he committed an unjustifiable homicide or illegally possessed a firearm as a felon. We disagree.

In evaluating a claim of insufficiency of evidence, "we review the entire record in the light most favorable to the judgment to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could have found the defendant guilty beyond a reasonable doubt." (*People v. Cole* (2004) 33 Cal.4th 1158, 1212.) "The federal standard of review is to the same effect: Under principles of federal due process, review for sufficiency of evidence entails not the determination whether the reviewing court itself believes the evidence at trial establishes guilt beyond a reasonable doubt, but, instead, whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. [Citation.]" (*People v. Rodriguez* (1999) 20 Cal.4th 1, 11.)

Defendant relies on isolated portions of the testimony of prosecution witnesses and his own testimony in support of his claim that, as a matter of law, his actions in self-defense and defense of others were reasonable. Specifically, he asks us to consider that the evidence presented at trial established that the victim (1) carried two firearms; (2) brandished the first firearm; (3) shot defendant; (4) reached for the second firearm; and (5) did not announce an intent to withdraw from the assault. The problem with defendant's argument is that it is based on his version of the incident, which was submitted to the jury and "apparently disbelieved by them." (*People v. Thomas* (1933) 135 Cal.App. 654, 659.) The dispositive issue before the jury was whether defendant reasonably believed, under all the facts and reasonable inferences, that he was threatened with such imminent danger as to justify shooting the victim in self-defense or defense of others. Given the totality of the evidence presented, the jury could reasonably find that (1) during the initial struggle between defendant and the victim, the victim's gun accidentally discharged, causing defendant to sustain a through-and-through gunshot wound in his leg; (2) once defendant disarmed the victim, the victim withdrew from the altercation by running away from defendant; [FN6] (3) defendant did not know the victim was armed with a second gun; [FN7] and (4) at no time did the victim reach for a second gun either while fleeing or after falling to the ground. [FN8] "The jurors were entitled to base their verdict upon the reasonable inferences to be drawn from the testimony offered by the prosecution and were not bound to accept the evidence [relied on] by the defense in opposition to such inferences." (*Id.* at p. 659.)

FN6. Contrary to defendant's contention, whether the victim's act of fleeing after being disarmed demonstrated his intent to withdraw from the altercation was a question of fact for the jury. (See *People v. Nem* (2003) 114 Cal.App.4th 160, 166-167 [withdrawal may be sufficient to communicate an intent to stop fighting in some situations and not others].)

FN7. Contrary to defendant's contention, there was no evidence conclusively demonstrating that he "knew Anderson had a second firearm." Defendant admittedly was not sure of the nature of the object that he felt in the victim's waistband while holding the victim in a bear hug. After defendant disarmed the victim, no witness corroborated defendant's testimony that the victim reached for his waistband as he ran away and after he fell to the ground. And, no witness, including defendant, ever saw the victim in possession of a second gun either as the victim ran away or after he fell to the ground.

FN8. Again relying on isolated portions of the record, defendant argues he acted reasonably, as a matter of law, because the victim's second gun was found underneath the victim's body and was "not concealed" at the time of

8

his death. However, the jury was free to find the victim's second gun was concealed based on Officer Turner's testimony that when the victim's body was rolled up for removal, a handgun was "sort of loosely in the clothes, the shirt at the [victim's] back," and, as the loose clothing was "rolled out of the way," the gun "sort of moved and fell onto the ground." The officer recalled "pretty clearly" that the gun fell from the rear clothing area of the body as the body was moved by members of the coroner's office. (See *Evje v. City Title Ins. Co.* (1953) 120 Cal.App.2d 488, 493 [judgment affirmed on testimony of a single witness rejecting argument that testimony was false in light of witness's own documents and admissions].)

We also reject defendant's argument that there was insufficient evidence to support his conviction for possession of a firearm by a felon. We recognize, as defendant argues, that the "statutory prohibition against a convicted felon having possession of a firearm is not absolute. For example, in *People v. King* (1978) 22 Cal.3d 12 [148 Cal. Rptr. 409, 582 P.2d 1000], the California Supreme Court ... held, 'when [a convicted felon] is in imminent peril of great bodily harm or reasonably believes himself or others to be in such danger, and without preconceived design on his part a firearm is made available to him, his temporary possession of that firearm for a period no longer than that in which the necessity or apparent necessity to use it in self-defense continues, does not violate [former] section 12021.' [Citation.] The court pointed out, however, that for self-defense or defense of others to excuse a violation of [former] section 12021, 'the use of the firearm must be reasonable under the circumstances and may be resorted to only if no other alternative means of avoiding the danger are available. In the case of a felon defending himself alone, such alternatives may include retreat where other persons would not be required to do so.' [Citation.]" (*People v. Pepper* (1996) 41 Cal.App.4th 1029, 1034-1035 (*Pepper*).)

Consistent with *Pepper*, the trial court instructed the jury on the concept of temporary possession of a firearm by a felon when needed for self-defense or defense of the others. [FN9] By its verdict, the jury clearly found the prosecution had proven that defendant as a convicted felon had not met the requirements for temporarily possessing a firearm to defend himself or others. (*People v. Martin* (2001) 25 Cal.4th 1180, 1191, fn. 9 (*Martin*).) Specifically, among other scenarios, the jury could reasonably find that after the victim had been shot twice and fell to the ground, defendant could have safely retreated to the getaway car without firing the last gunshot, which fatally wounded the prone victim. Alternatively, the jury could have determined that after the shooting defendant intended to retain possession of the gun, leaving it in Tompkins' car, without intending to turn the gun over to the authorities or otherwise arrange for the gun's safe disposal. [FN10] (See *People v. Ratcliff* (1990) 223 Cal.App.3d 1401, 1414 ["[c]ommission of a crime under [section 29800] is complete once the intent to possess is perfected by possession;" "[w]hat the ex-felon does with the firearm later is another separate and distinct transaction undertaken with an additional intent which necessarily is something more than the mere intent to possess the proscribed firearm"]; see also *Martin, supra,* at p. 1191 [court recognized that allowing for only a "momentary possession" of a firearm by a felon serves the salutary purpose and sound public policy of encouraging disposal and discouraging retention of dangerous items such as firearms].)

FN9. Specifically, the jury was told defendant's possession of the victim's firearm would not violate the prohibition against felons possessing firearms if the jury found that defendant "as a reasonable person had grounds for believing and did believe that he was or others were in imminent peril of great bodily harm;" without a preconceived design on his part, a firearm

was made available to him; his possession of such firearm was "temporary and for a period of time no longer than that in which the necessity or apparent necessity to use it in self-defense continued;" and "[t]he use of the firearm was reasonable under the circumstances and was resorted to only if no alternative means of avoiding the danger were available."

FN10. "Although the crime of possession of a firearm by a felon may involve the act of personally carrying or being in actual *physical* possession of the firearm, ..., such an act is not an essential element of a violation of the [former] section 12021(a) because a conviction of this offense also may be based on a defendant's *constructive* possession of a firearm. (See *People v. Sifuentes* (2011) 195 Cal.App.4th 1410, 1417 [125 Cal.Rptr.3d 903]; *People v. Mejia* (1999) 72 Cal.App.4th 1269, 1272 [85 Cal.Rptr.2d 690] [defendant need not physically have the weapon on his person; constructive possession of a firearm 'is established by showing a knowing exercise of dominion and control' over it].) ... [¶] Thus, while the act of being armed with a firearm—that is, having ready access to a firearm [citation]—necessarily requires possession of the firearm, possession of a firearm does not necessarily require that the possessor be armed with it." (*People v. White* (2014) 223 Cal.App.4th 512, 524.)

In sum, we conclude defendant's "insufficiency of the evidence argument[s] simply ask us to reweigh the facts," which "we cannot do." (*People v. Gutierrez* (2009) 174 Cal.App.4th 515, 519, citing *People v. Bolin* (1998) 18 Cal.4th 297, 331-333.) The cases cited by defendant do not compel a different conclusion on this record. [FN11]

FN11. Defendant also contends the "trial court wrongly denied" his section 1181.1 motion for acquittal based on insufficiency of evidence made at the conclusion of the prosecution's case-in-chief, and his later motion for a new trial based on a claim there was insufficient evidence to support his convictions. Having presented no separate substantive arguments explaining why those rulings were in error, we need not and do not address those rulings.

Pet. Exh. 1, at 6–10.

To start, the State Appellate Court applied the correct federal standard from *Jackson v. Virginia*, 443 U.S. 307 (1979), *reh'g denied*, 444 U.S. 890 (1979), to analyze Petitioner's sufficiency of the evidence claim. *See* Pet. Exh. 1, at 7 (quoting *People v. Rodriguez*, 20 Cal.4th 1, 11 (1999) (applying *Jackson*)); *see also* 28 U.S.C. § 2254(d). The *Jackson* standard derives from the Fourteenth Amendment's Due Process Clause, which "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970).

The State Appellate Court reasonably applied the correct legal standard to Petitioner's claim. *See* 28 U.S.C. § 2254(d); *Williams*, 529 U.S. at 413. The Supreme Court has emphasized

10

that claims contesting the sufficiency of the evidence "face a high bar in federal habeas proceedings." *Coleman v. Johnson*, 566 U.S. 650, 651 (2012) (per curiam); *see also id.* at 655 (finding that the appellate court "unduly impinged on the jury's role as factfinder" when it engaged in "fine-grained factual parsing" to deem the evidence insufficient to support the conviction); *see also Jackson*, 443 U.S. at 319 (explaining that the standard "impinges upon 'jury' discretion only to the extent necessary to guarantee the fundamental protection of due process of law").

A federal court reviewing collaterally a state court conviction does not determine whether it is satisfied that the evidence established guilt beyond a reasonable doubt. *Payne v. Borg*, 982 F.2d 335, 338 (9th Cir. 1992). "The federal court determines only whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Payne*, 982 F.2d at 338 (quoting *Jackson*, 443 U.S. at 319) (internal quotation marks omitted); *see also Coleman*, 566 U.S. at 656 (explaining that, under Supreme Court standards, "the only question under *Jackson* is whether [the jury's finding of guilt] was so insupportable as to fall below the threshold of bare rationality"). Hence, the "standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 318–19. Only if no rational trier of fact could have found proof of guilt beyond a reasonable doubt, has there been a due process violation. *Jackson*, 443 U.S. at 324. Furthermore, where a state court has issued a reasoned opinion for denying a petitioner's sufficiency of the evidence claim, AEDPA requires the federal court to apply the standards of *Jackson* with an additional layer of deference by asking whether the state court's application of *Jackson* and *Winship* was unreasonable. *Juan v. Allen*, 408 F.3d 1262, 1274-75 (9th Cir. 2005), *cert. denied*, 546 U.S. 1137 (2006).

To assess a habeas petition, the Court looks to California state law to establish the elements of the crimes at issue and then turns to the federal question of whether the State Appellate Court was objectively unreasonable in its conclusion that sufficient evidence supported its decision. *See Johnson v. Montgomery*, 899 F.3d 1052, 1056 (9th Cir. Aug. 15, 2018); *Jackson*,

443 U.S. at 324 n.16.

### 1. Voluntary Manslaughter

Petitioner asserts that the Prosecution failed to satisfy beyond a reasonable doubt the intent element of voluntary manslaughter. *See* Pet. 21. In California, voluntary manslaughter is "the unlawful killing of a human being without malice, upon a sudden quarrel or heat of passion." Cal. Pen. Code § 192. "A defendant commits voluntary manslaughter when a homicide that is committed with either intent to kill or with conscious disregard for life—and therefore would normally constitute murder—is nevertheless reduced or mitigated to manslaughter." *People v. Bryant*, 56 Cal. 4th 959, 968 (2013). In application, voluntary manslaughter may be found where a defendant acts either in a sudden quarrel or heat of passion or with the actual but unreasonable belief that defense was necessary to protect against imminent danger to life or great bodily injury (*i.e.*, imperfect self-defense). *See People v. Blakeley*, 23 Cal. 4th 82, 85 (2000) (killing with conscious disregard for life and the knowledge that the conduct is life-endangering); *see also People v. Lasko*, 23 Cal. 4th 101, 104 (2000) (killing in a sudden quarrel or heat of passion); *People v. Humphrey*, 13 Cal. 4th 1073, 1082 (1996) ("[F]or either perfect or imperfect self-defense, the fear must be of . . . *imminent* danger to life or great bodily injury.") (internal citations and quotation marks omitted).

It appears that Petitioner challenges the sufficiency of the evidence showing that he possessed the required intent for voluntary manslaughter because his actions were justified as a matter of law under a theory of perfect defense of self or others. *See* Pet. 21–24. After viewing the evidence in the light most favorable to the Prosecution, the Court finds the State Appellate Court's rejection of this argument was not unreasonable. *See Jackson*, 443 U.S. at 324. Any rational trier of fact could have found that Petitioner acted unreasonably. *See Payne*, 982 F.2d at 338. The State Appellate Court reviewed what the record showed: (1) Petitioner's friend fought with the Victim's friend; (2) the Victim drew a gun; (3) Petitioner bear-hugged the Victim; (4) the Victim shot Petitioner; (5) Petitioner wrested the gun away from the Victim; (6) the Victim ran; (7) Petitioner fired several shots; (8) the Victim collapsed; (9) Petitioner shot the Victim again; (10) Petitioner fled with the gun; and (11) officers found a second gun near the Victim's

waistband at the scene.  *See* Pet. Exh. 1, at 7–8.

The State Appellate Court explored the parties' competing versions of the shooting and reasonably concluded, "[t]he problem with [Petitioner's] argument is that it is based on his version of the incident, which was submitted to the jury and apparently disbelieved by them."  *See* Pet. Exh. 1, at 7 (internal citations and quotation marks omitted).  As the State Appellate Court explained, "the jury could reasonably find that (1) during the initial struggle between defendant and the victim, the victim's gun accidentally discharged, causing defendant to sustain a through-and-through gunshot wound in his leg; (2) once defendant disarmed the victim, the victim withdrew from the altercation by running away from defendant; (3) defendant did not know the victim was armed with a second gun; and (4) at no time did the victim reach for a second gun either while fleeing or after falling to the ground."  Pet. Exh. 1, at 7–8 (internal footnotes omitted). In such a scenario, a jury could reasonably conclude that neither Petitioner's actions were reasonable nor was he in imminent danger.  Indeed, Petitioner's sufficiency of the evidence argument simply seeks to reweigh facts, which is the province of the jury.  *See* Pet. Exh. 1, at 10. Thus, because the State Appellate Court's rejection of this claim was not objectively unreasonable, Petitioner cannot obtain habeas relief as to the first claim for his voluntary manslaughter conviction.  28 U.S.C. § 2254(d)(1).

### 2.  Possession of a Firearm by a Felon

Petitioner further asserts that, because he acted in defense of self or others, the Prosecution failed to establish voluntary possession of a firearm by a felon beyond a reasonable doubt.  Pet. 23–24.  In California, a convicted felon may not have in his or her possession, custody, or control a concealable firearm.  *People v. King*, 22 Cal. 3d 12, 15 n.1 (1978) (citing Cal. Pen. Code § 12021(a)); *see also* Cal. Pen. Code § 29800.[4]  This law does not, however, prohibit convicted felons from using a concealable firearm in defense of self or others in emergency situations. *People v. King*, 22 Cal. 3d 12, 15 (1978).  Instead, when a convicted felon "is in imminent peril of great bodily harm or reasonably believes himself or others to be in such danger, and without

---

[4] Effective January 1, 2012, Cal. Pen. Code § 29800(a) continues former Cal. Pen. Code § 12021(a) without substantive change.

preconceived design on his part a firearm is made available to him, his temporary possession of that weapon for a period no longer than that in which the necessity or apparent necessity to use it in self-defense continues, does not violate [the law prohibiting possession of a firearm by a felon]." *Id.* at 24. That said, "the use of the firearm must be reasonable under the circumstances and may be resorted to only if no other alternative means of avoiding the danger are available. In the case of a felon defending himself alone, such alternatives may include retreat where other persons would not be required to do so." *Id.*

Petitioner argues that he took possession of the gun only for defensive purposes after he was shot and "left the gun on the floor of the car immediately after obtaining safety." Pet. 24. After viewing the evidence in the light most favorable to the Prosecution, the Court again finds that the State Appellate Court's rejection of this argument was not unreasonable. *See Jackson*, 443 U.S. at 324. As explained above, any rational trier of fact could have found that Petitioner acted unreasonably in possessing the gun to shoot the Victim—both when the Victim began to run and when he lay on the ground. *See Payne*, 982 F.2d at 338 ("The federal court determines only whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.") (internal citation and quotation marks omitted).

The Trial Court instructed the jury on the concept of temporary possession of a firearm by a felon when needed for self-defense or defense of the others, allowing the jury to consider the facts in light of Petitioner's potential reasons for shooting. Pet. Exh. 1, at 9. The State Appellate Court reviewed all the facts and concluded that a jury could reasonably convict Petitioner. Pet. Exh. 1, at 9. For example, the jury could have reasonably found that Petitioner was safe to retreat once the Victim fell to the ground. Pet. Exh. 1, at 9. Or the jury could have found that Petitioner intended not to hand the gun over to authorities when he took it to the car. Pet. Exh. 1, at 9–10 (citing *People v. Martin*, 25 Cal. 4th 1180, 1191 (2001) ("[R]ecognition of a 'momentary possession' defense serves the salutary purpose and sound public policy of encouraging disposal and discouraging retention of dangerous items such as . . . firearms."). Hence, here too Petitioner essentially asks this Court to reweigh facts, which the Court will not do. *See* Pet. Exh. 1, at 7.

Thus, because the State Appellate Court's rejection of this claim was not objectively unreasonable, Petitioner cannot obtain habeas relief as to the second claim regarding Petitioner's excuse for temporary possession of a firearm by a felon. 28 U.S.C. § 2254(d)(1).

Based on the foregoing analysis, habeas relief is not available as to Claim 1 regarding the sufficiency of the evidence.

### B. Alleged Prosecutorial Misconduct for Failing to Disclose Evidence (Claims 2, 3, & 6)

There is no dispute that the Prosecution did not timely disclose that the three workers at the taco truck sought U-Visa[5] applications for assisting the Prosecution with Petitioner's case. *See* Pet. Exh. 1, at 11–19; Resp. 12. In connection with this delayed disclosure, Petitioner asserts three claims: (1) the Prosecution's delay in disclosure resulted in an unfair trial; (2) the Trial Court erred in refusing to strike the witnesses' testimony or dismiss the charges; and (3) the Trial Court's admonishment and instruction were insufficient to cure the resulting harm.[6] Pet. 24, 47–48, 52, 61, 63. The State Appellate Court evaluated these claims together on direct appeal, rejecting all of them:

> II. Prosecution's Late Disclosure of Evidence in Alleged Violation of *Brady v. Maryland* (1963) 373 U.S. 83 (*Brady*) [FN12] and Section 1054
>
> FN12. " 'Under *Brady*, the prosecution violates a defendant's federal due process rights when it suppresses evidence material to *the defendant's guilt or punishment, regardless of the good faith belief of the prosecution.* (*Brady, supra,* 373 U.S. at p. 87.)' " (*People v. Lewis* (2015) 240 Cal.App.4th 257, 263 (*Lewis*); italics added.)
>
> A. Relevant Facts
>
> Prior to the preliminary hearing in September 2011, the assigned Deputy District Attorney (DDA) Brian Owens interviewed the three taco food truck workers, Eleazar, Jorge and Rivas (hereinafter also referred to as the three witnesses). DDA Owens knew the three witnesses "were here illegally," but he did not discuss their immigration status with them. Each witness was subpoenaed to appear at the preliminary hearing. However, only Jorge testified at the preliminary

---

[5] "An I-918 Supplement B, U Nonimmigrant Status Certification, signed by an appropriate District Attorney, 'is necessary for undocumented individuals, unlawfully in the United States, to obtain Temporary Resident status for themselves, their spouses, their children, and their siblings, by providing helpful testimony to the District Attorney.'" Pet. Exh. 1 at 11 n. 13.

[6] Petitioner also brings several ineffective counsel claims associated with the Prosecution's alleged *Brady* violation. These claims are discussed below with the other ineffective counsel claims.

hearing. After the preliminary hearing, the case was assigned for trial to DDA Mas Morimoto.

After the preliminary hearing, in April 2012, DDA Owens received an email from the three witnesses' immigration attorney requesting that DDA Owens sign the witnesses' I-918 Supplement B, U Nonimmigrant Status Certifications (hereinafter referred to as the U-Visa applications). [FN13] The U-Visa applications were attached to the email. [FN14] Because DDA Owens was no longer assigned to the case, he sent the email and attachments to DDA Morimoto. Four months later, in August 2012, the witnesses' immigration attorney contacted DDA Morimoto and inquired if the District Attorney's office was "still open" to signing the U-Visa applications. DDA Morimoto responded that "nothing could be done" or "nothing would even be considered" until defendant's trial was over. In September 2012, defendant moved in limine for disclosure of all *Brady* evidence not previously disclosed by the prosecution. The prosecution did not disclose the existence of the U-Visa applications at that time.

FN13. An I-918 Supplement B, U Nonimmigrant Status Certification, signed by an appropriate District Attorney, "is necessary for undocumented individuals, unlawfully in the United States, to obtain Temporary Resident status for themselves, their spouses, their children, and their siblings, by providing helpful testimony to the District Attorney. [¶] There are four statutory eligibility requirements for obtaining U Nonimmigrant Status: [¶] The individual must have suffered substantial physical or mental abuse as a result of having been a victim of a qualifying criminal activity. [¶] The individual must have information concerning that criminal activity. [¶] The individual must have been helpful, is being helpful, or is likely to be helpful in the investigation or prosecution of the crime. [¶] The criminal activity violated U.S. laws."

FN14. The U-Visa applications detailed the terms under which the three witnesses "intended to be helpful" to the District Attorney. According to specific terms set forth in the U-Visa applications, the three witnesses were required to willingly provide "eyewitness" testimony about the alleged offenses charged against defendant. The U-Visa applications also had attached separate evaluations of each witness prepared by a psychologist to establish the required element that the witnesses suffered substantial mental abuse as a consequence of witnessing the incident. The psychologist's evaluations contained a narrative of each witness's description of the incident.

On October 1, 2012, the trial commenced with opening statements and the taking of testimony of Hawkins and Wilkins, with Wilkins completing his testimony on the morning of October 2, 2012. DDA Morimoto then called Eleazar as a witness. Just before he took the stand, Eleazar "mentioned something about the visa" to the prosecutor. The witness's comment prompted DDA Morimoto to ask defense counsel whether she was aware of the three witnesses' immigration statuses and that they had retained counsel. According to defense counsel, DDA Morimoto "made a vague, offhand oral comment ... that the [three] witnesses had retained an attorney, and wanted the District Attorney to sign an affidavit saying they were cooperative witnesses for immigration purposes." DDA Morimoto did not then disclose the nature of the affidavit he referred to, the content of discussions between the three witnesses and members of the District Attorney's office, the existence of the completed U-Visa applications and attached declarations, or that the district attorney's office was then in actual possession of the U-Visa applications. However, defense counsel's response to DDA Morimoto's comment

suggested that defense counsel was not aware of the existence of the U-Visa applications. The trial then proceeded with the direct and cross-examination of Eleazar, Jorge, and Rivas, respectively. [FN15]

> FN15. During their testimony, Eleazar, Jorge, and Rivas, described the conduct of the men and women they saw in the parking lot by their skin color, height, and age range. Neither Eleazar nor Jorge made in-court identifications of any of the men or women they saw in the parking lot on the day of the shooting. Rivas described defendant as looking like the "shorter man," who he had previously described as approximately 32 years old, with a fuller build. For the sake of clarity, and as necessary, when recounting the testimony of Eleazar, Jorge, and Rivas, we shall refer to the actions of defendant, the victim, Thompkins, and Hawkins, by appellation or name, based on the undisputed testimony of other percipient witnesses.

Eleazar testified he had been working inside the taco food truck, when Rivas indicated there were people arguing outside and someone had taken out a firearm. Eleazar did not look outside, but crouched down on the floor of the truck. As he was calling 911 [FN16] to report the incident, Eleazar heard the first gunshot. Eleazar remained on the floor of the truck and heard five or six more gunshots. He estimated that approximately one minute after the final gunshot, he got up, looked outside, and saw defendant and Thompkins get into a car and leave the parking lot.

> FN16. The tape-recorded 911 call was played for the jury.

Jorge testified he had also been working inside the taco food truck, when he heard Rivas say there were people "fighting" in the parking lot. Jorge looked outside and saw Thompkins hit the victim in the face. The victim reacted by pulling out a gun from his waistband. [FN17] Jorge then saw defendant put the victim in a bear hug. The victim's arms were extended downward and trapped within defendant's arms. While defendant held the victim in a bear hug, Thompkins hit the victim in the face several times. Jorge heard a gunshot, and he ducked down and did not see what happened next. When Jorge got up he looked outside and saw the victim running towards the driveway of the parking lot. The victim no longer had a gun. As the victim ran through the parking lot, Jorge saw defendant, with a gun, and heard three or four gunshots. Jorge could not tell in which direction defendant was shooting. Jorge again ducked down to the floor of the truck. When he again got up and looked outside, the victim was already on the ground. Jorge could not tell if the victim was moving or not. He did not remember if anyone else was near the victim other than defendant. Jorge testified he heard and saw another gunshot fired by defendant. When defendant fired the gun he was standing approximately several feet from the victim. Jorge could see that defendant was aiming the gun when he fired the last gunshot, but Jorge could not see at what part of the prone victim the defendant was aiming the gun. After listening to the tape-recorded 911 call in court, Jorge testified that he remembered hearing the first gunshot (when defendant and the victim were struggling for the firearm), a second gunshot, then five more gunshots as the victim ran through the parking lot, followed by a final gunshot as the victim lay prone on the ground. After the final gunshot defendant and Thompkins ran to the car and left the parking lot.

> FN17. After reviewing his statement to the police, Jorge confirmed that he had told the police that Thompkins had punched one of the men, but not the victim, and that the victim then removed a gun from his waistband.

Rivas testified that he observed the altercation between Thompkins and

17

Hawkins. During that altercation, the victim pulled out a gun from his waistband. Defendant ran over and put his arms around the victim so he could not fire the gun. While defendant and the victim were struggling, Thompkins came over and hit the victim in the face. Rivas heard a gunshot, but he did not see the gun at that time. Once he heard the gunshot, Rivas threw himself down on the floor of the truck. While on the floor, Rivas heard two more gunshots "in a row," and then a few seconds later, he "heard" three or four gunshots. After reviewing his transcribed statement given to the police, Rivas testified in court that he had told the police what Jorge said to Rivas concerning Jorge's observations of the incident. According to Rivas, Jorge said the "guys had taken the gun away from [the victim], and with the same gun, they had killed" the victim; "they followed [the victim] to finish him off."

Neither the prosecution nor the defense questioned Eleazar or Jorge about their immigration status. Defense counsel briefly questioned Rivas about his immigration status. Rivas confirmed that he needed a signed affidavit indicating he was a cooperative witness for the prosecution, but as of that date no one from the District Attorney's office had signed the affidavit. Eleazar and Rivas were released without being subject to recall, and Jorge was released subject to recall.

The following day (October 4, 2012), outside the presence of the jury, DDA Morimoto informed the court of the existence of the U-Visa applications, and that the prosecution had not disclosed this evidence to the defense. The U-Visa applications were provided to the court, for examination, at an ex parte in camera hearing. After review, the court found some portions of the U-Visa applications were discoverable and ordered the prosecution to immediately disclose the material to defense counsel. [FN18]

FN18. The clerk's transcript in the record on appeal includes those portions of the U-Visa applications released to defense counsel, including portions of the psychologist's evaluations that include the three witnesses' narrative descriptions of the incident and the effect of the incident on each witness's mental health including that each witness was suffering symptoms characteristic of post-traumatic stress disorder as well as other psychological symptoms of depression (Rivas), and insomnia, anxiety episodes, and dysthymic disorder (form of depression) (Eleazar and Jorge). The court refused to disclose those portions of the U-Visa applications concerning privileged medical and psychological information. At defendant's request, we granted his motion to augment the record "to include a supplemental [sealed] clerk's transcript consisting of the documents placed under seal by the trial court on October 4, 2012, identified as "U-Visa applications prepared for witnesses [Rivas, Jorge, and Eleazar]." However, we denied defendant's motion to unseal the supplemental clerk's transcript finding that "the right to appellate review is limited to a determination as to whether the [trial] court's ruling was correct. This court may make its determination by reviewing the materials sealed by the trial court." In his briefs on direct appeal, defendant asks this court to review in camera the sealed portions of the U-Visa applications and to order full disclosure of the U-Visa applications. He argues the information contained in the U-Visa applications should not be treated as privileged information, and, the information is material to his defense and relevant to the witnesses' memories of the incident. We have reviewed the sealed records submitted to this court and conclude there is no discoverable information that is material to defendant's defense or relevant to the witnesses' memories of the incident. Accordingly, we deny his request to order full disclosure of the U-Visa applications.

Trial resumed on October 9, 2012. After the jury was excused for the day, defendant moved to dismiss or strike the testimony of the three witnesses based on the prosecution's failure to disclose the U-Visa applications. The prosecutor opposed the motion. The court conducted an evidentiary hearing in which three witnesses from the District Attorney's office, DDA Brian Owens, District Attorney (DA) Investigator Gustavo Galindo, and DA Inspector Patrick Johnson, testified regarding two issues: (1) the prosecution's failure to disclose the U-Visa applications with regard to any potential immigration benefits that might accrue to the witnesses for giving helpful eyewitness testimony; and (2) the prosecution's failure to disclose the attachment to each U-Visa application, namely, a psychologist's report, dated April 2012, for each witness, which contained each witness' narrative description of the incident. Defense counsel also apprised the court of her discussion with the witnesses' immigration attorney.

Following the hearing and argument by counsel, the court ruled on defendant's motion to dismiss or strike the testimony of the three witnesses in the following manner. The court first determined that although the prosecution had made no promises to the three witnesses, the information in the U-Visa applications was "material and could be relevant for purposes of impeachment." Regarding the prosecution's failure to disclose the psychologist's reports attached to the U-Visa applications, the court found that because Eleazar and Rivas had not testified at the preliminary hearing, an informed decision could not have been made as to the disclosure of those reports until those witnesses testified at trial. However, the court found that because Jorge had testified at the preliminary hearing, the prosecution should have placed under seal his psychologist's report and requested an in-camera hearing prior to the witness's trial testimony. Nonetheless, the court did not find sufficient grounds at that time to dismiss the charges against defendant. The court indicated the trial would proceed, with the proviso that the court would entertain a mistrial motion in the event that the witnesses testified in such a way as to give cause for the court to believe there had been "a direct violation of the Constitution." Regarding the issue of sanctions for the prosecution's late disclosure of the U-Visa applications, the court asked the parties to craft a stipulation to be read to the jury concerning the prosecution's late disclosure and special jury instruction to be given at the conclusion of the trial. The court also directed the prosecution to make each witness available for further examination subject to having the testimony of Eleazar and Rivas stricken if they became unavailable; the court did not make a similar ruling as to Jorge. Following this ruling, the court asked defense counsel if there was a need for a continuance based on the new disclosures or the information counsel received in court that day. Defense counsel replied she was not seeking a continuance. Instead, she asked the court to order the prosecutor to make the three witnesses available the next morning for further questioning. The court granted the request, but gave the prosecutor an additional day until Thursday, October 11, to produce the three witnesses.

On Thursday, October 11, before the recall of Rivas as a witness, the court read a stipulation to the jury, advising them, in pertinent part, regarding the prosecution's late disclosure of the U-Visa applications, which had been in the prosecution's possession since April 17, 2012. The court described the U-Visa applications, noting that each application included a psychologist's evaluation of the witness. The court further explained that "[a]lthough the People's failure to timely disclose evidence was without legal justification, the court has, under the law, permitted the production of this evidence after the court was informed of the existence of the applications and attached [psychologist's] reports by the People on October 4th 2012." The jury was informed the prosecution had disclosed portions of the U-Visa applications to the defense, and "[t]he defense is now entitled to additional cross-examination of all three witnesses."

19

Defense counsel then recalled Rivas as a witness. Rivas, when questioned about his immigration status, confirmed that he, Jorge, and Eleazar, together, had hired an immigration attorney after the incident. Rivas filled out a "form" to obtain legal status, which was important to him because he had children here and his brother had asked him to look into the matter. Rivas was not aware of any promises made by the prosecution regarding the U-Visa application. At the conclusion of Rivas' testimony, defense counsel declined the court's invitation to call any other witnesses for further cross-examination. At the end of the trial session on October 11, outside the jury's presence, the prosecutor put on the record his compliance with the court's order to produce Jorge and Eleazar. Specifically, the prosecutor informed the court that "Jorge Estrada and Eleazar Estrada were both here this morning as well as this afternoon and available to be recalled as witnesses by the defense." Defense counsel confirmed that the witnesses had been made available for further cross-examination, but she had informed the prosecution that the defense would not be calling Jorge and Eleazar as witnesses.

During the ensuing jury instruction conference, the court discussed with counsel a special instruction regarding the prosecution's late disclosure using some language in CALJIC No. 2.28. In pertinent part, the prosecutor argued that because the disclosed portions of the U-Visa applications were not offered into evidence, any characterization of the witnesses' statements in those applications as being "material ... relevant [or] exculpatory," was inappropriate. Conversely, defense counsel argued the jury should be advised as to (a) the "materiality," "relevancy," and "exculpatory nature" of the evidence that was concealed by the prosecution, and (b) the prosecution's failure to disclose, even if the defense chose not to use the disclosed information or re-examine the witnesses on the subject in light of their previous lengthy testimony. Over defense counsel's objection, the court eliminated any reference in the special jury instruction to the prosecution's conduct as being a "concealment" of the U-Visa applications, opting to refer to the prosecution's conduct as a late disclosure of evidence. Defense counsel lodged no other objection to any other modifications made by the court to the special jury instruction. Thereafter, as part of its closing instructions, the court again advised the jurors of the prosecution's failure to timely disclose the U-Visa applications, in which the witnesses purported to be willing to provide eyewitness testimony for the prosecution; that the U-Visa applications contained "evidence regarding the credibility of the witnesses and expectations of profound benefit in exchange for 'helpful' testimony from all three individuals;" that "[t]he weight and significance of the delayed disclosure are matters for your consideration;" and that the jury "should consider whether the untimely disclosed evidence pertains to a fact of importance, something trivial or subject matters already established by other credible evidence."

During his initial closing remarks, the trial prosecutor made no mention of the testimony of Jorge and Eleazar, and asked the jury to consider that aspect of Rivas' testimony concerning his observations before the victim first pulled out a gun from his waistband. In response, defense counsel made an extensive argument regarding the testimony of Jorge and Rivas, pointing to inconsistencies and noting each witness may have been influenced by their need to provide helpful eyewitness testimony to secure legal status. In rebuttal, without objection, the prosecutor argued, in pertinent part, that there was no evidence that the three witnesses had "shaped their testimony" to be helpful to the prosecution, the three witnesses were not able to identify defendant in court, there was no evidence the prosecution had made any promises to the three witnesses, and the defense had not recalled two of the witnesses to discuss their immigration status. The prosecutor also described in detail how most, if not all, of the testimony given by Jorge and Rivas was consistent with the testimony of other prosecution witnesses and/or the physical

20

evidence.

B. Analysis

Defendant argues he is entitled to a new trial because the prosecution committed a *Brady* violation by intentionally suppressing the U-Visa applications. We disagree.

"There are three elements to a *Brady* violation: (1) the state withholds evidence, either willfully or inadvertently, (2) the evidence at issue is favorable to the defendant, either because it is exculpatory or impeaching, and (3) the evidence is material. [Citation.]" (*Lewis, supra*, 240 Cal.App.4th at p. 263, citing to *Strickler v. Greene* (1999) 527 U.S. 263, 281-282.) In evaluating the effect of a *Brady* violation, "the question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A 'reasonable probability' of a different result is accordingly shown when the government's evidentiary suppression 'undermines confidence in the outcome of the trial.' [Citation.]" (*Kyles v. Whitley* (1995) 514 U.S. 419, 434 (*Kyles*).)

After independently reviewing both the unsealed and sealed portions of the U-Visa applications of Rivas, Jorge, and Eleazar, we conclude there is no reason to order a new trial based on a *Brady* violation because the late disclosure of the U-Visa applications does not undermine "our confidence in the verdict." (*Lewis, supra*, 240 Cal.App.4th at p. 263.) As noted previously, there was no material dispute as to the events that occurred before defendant disarmed the victim: the victim drew a loaded gun in response to a fistfight between Thompkins and Hawkins, defendant held the victim in a bear hug to prevent the victim's use of the gun, and during the struggle for the gun, defendant was shot in the leg, but he was ultimately able to disarm the victim. The dispositive issue at trial was whether defendant acted in self-defense or defense of others when he fired the gun at the victim. This theory, in turn, was based on the reasonableness of defendant's belief that the victim was reaching for a second gun as he ran away from defendant and after he fell to the ground. "The most persuasive evidence that [defendant] felt compelled to shoot [the victim] in self-defense [and defense of others] necessarily came from [defendant]." (*Reis-Campos v. Biter* (9th Cir. 2016) 832 F.3d 968 [2016 U.S. App. Lexis 14519, *18, 2016 WL 4174770].) Except for defendant, no other witness testified that after being disarmed the victim reached for his waistband. Additionally, no witness, including defendant, testified that after being disarmed the victim actually possessed a second gun. Moreover, the U-Visa applications do not provide support or otherwise corroborate defendant's claim that he fired the gun at the victim because he reasonably believed the victim was reaching for a second gun in his waistband. [FN19] Thus, we are confident the verdicts would not have changed had the jury learned of the disclosed information in the U-Visa applications, i.e., the witnesses' narratives of the incident or that the witnesses suffered from certain psychological symptoms as a consequence of the incident. [FN20] (*Kyles, supra*, 514 U.S. at p. 434.)

FN19. In Rivas 's U-Visa application, it was reported that Rivas believed he saw the victim fire his handgun once and hit defendant before the victim was disarmed, that defendant took the gun from the victim, and defendant, using the victim's gun, shot the victim and then fired a second shot at close range, hitting the victim while he was lying on the ground. And, in Eleazar's U-Visa application, it was reported that Eleazar had seen two men attempt to disarm the victim, causing Eleazar to duck down, and while he

took cover, he heard gunshots, and later, he got up and saw the victim lying dead.

In Jorge's U-Visa application, it was reported that Jorge saw a fight between a group of teenagers and "two couples...." "One of the teenagers pulled out a handgun and one of the men in the second group began struggling with him to disarm him. The rest of the teenagers ran away, but the other man in the second group soon joined the struggle for the handgun. [¶] [Jorge] then heard a shot, he and his two co-workers ducked. When he raised his head again, he noticed that one of the men was now in possession of the handgun. A second shot was fired and [Jorge] saw the teenager trying to get up, but he was shot again." Contrary to defendant's contention, Jorge's reported narrative does not corroborate defendant's testimony that the victim looked like he was reaching for a second gun, nor is the narrative otherwise "material" as it does not " 'tend in reason to prove that [defendant's] fear was reasonable' " at the time he fired the gun while the victim was prone on the ground.

FN20. The cases cited by defendant are factually inapposite and do not otherwise support reversal on this ground. (See, e.g., *Giglio v. United States* (1972) 405 U.S 150, 154 [new trial ordered where government failed to disclose evidence of any understanding or agreement as to a future prosecution of the defendant's coconspirator, where the Government's case depended almost entirely on the witness's testimony, and without it there could have been no indictment and no evidence to carry the case to the jury]; *Comstock v. Humphries* (9th Cir. 2015) 786 F.3d 701, 706 [*Brady* violation found where evidence impeaching victim's trial testimony was not disclosed until after trial]; *Amado v. Gonzalez* (9th Cir. 2014) 758 F.3d 1119, 1127 [*Brady* violation found where evidence impeaching testimony of key prosecution witness was not disclosed during the trial]; *Silva v. Woodford* (9th Cir. 2002) 279 F.3d 825, 828 [court granted evidentiary hearing into defendant's *Brady* claim that the prosecution failed to disclose an agreement that the state's key witness not be psychiatrically examined until after the trial].)

We also see no merit to defendant's argument that, under section 1054, the trial court should have granted his motion to dismiss the charges or strike in its entirety the testimony of Rivas, Jorge, and Eleazar. [FN21] "Where there has been a failure of discovery the normal remedy is not dismissal or suppression of evidence, but a continuance to enable the defense to meet the new evidence. [Citations.]" (*In re Jessie L.* (1982) 131 Cal.App.3d 202, 210, citing to *People v. Reyes* (1974) 12 Cal.3d 486, 501-502, and *People v. McGowan* (1980) 105 Cal.App.3d 997, 1002; see § 1054.5, subds. (b), (c); *People v. Superior Court (Mitchell)* (2010) 184 Cal.App.4th 451, 459 [trial court may exclude witnesses' testimony as late discovery sanction " 'only if all other sanctions have been exhausted' "].) Here, as indicated above, defendant received the pertinent portions of the U-Visa applications, the trial court offered a continuance to the defense, and, contrary to defendant's contention, the three witnesses were made available and defense counsel had the opportunity to recall them for further questioning. We therefore see no basis for reversal on this ground. [FN22]

FN21. Section 1054.5 provides, in pertinent part: "(b) ... Upon a showing that a party has not complied with Section 1054.1 or 1054.3 and upon a showing that the moving party complied with the informal discovery procedure provided in this subdivision, a court may make any order necessary to enforce the provisions of this chapter, including, but not

limited to, immediate disclosure, contempt proceedings, delaying or prohibiting the testimony of a witness or the presentation of real evidence, continuance of the matter, or any other lawful order.  Further, the court may advise the jury of any failure or refusal to disclose and of any untimely disclosure.  [¶]  (c) The court may prohibit the testimony of a witness pursuant to subdivision (b) only if all other sanctions have been exhausted.  The court shall not dismiss a charge pursuant to subdivision (b) unless required to do so by the Constitution of the United States."

FN22.  Defendant complains, on his direct appeal and in his petition for writ of habeas corpus, that his trial counsel was ineffective for failing to request a continuance, failing to question Rivas about the narrative of the incident reported in his U-Visa application, failing to renew the motion to strike the testimony of Eleazar and Jorge when those witnesses were unavailable to testify, and, assuming Eleazar and Jorge were available to testify, failing to recall them as witnesses because their testimony "would have been material, necessary and admissible," and failing to introduce all material evidence contained in the U-Visa applications concerning " the witnesses' immigration status, PTSD, and recollection of the shooting."  However, defendant has failed to demonstrate that either a continuance, or the exculpatory or impeachment evidence that counsel could have revealed by the admission of the redacted U-Visa applications and further questioning of the witnesses, "would have produced a more favorable result at trial." (*People v. Cox* (1991) 53 Cal.3d 618, 662, disapproved in part on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22 (*Doolin*).) (See *Strickland v. Washington* (1984) 466 U.S. 668, 697 (*Strickland*) [claim of ineffective assistance of counsel may be resolved solely by "examining the prejudice suffered by the defendant as a result of the alleged deficiencies"].)

Defendant also challenges the jury admonition (stipulation read to the jury before the recall of Rivas as a witness) and the special jury instruction regarding the prosecution's late disclosure of the U-Visa applications.  He contends the jury was not provided with sufficient guidance to evaluate the significance of the late disclosure or otherwise make adverse findings regarding the late disclosure if the jury found the disclosed evidence was material.  However, the record shows both defense counsel and the prosecutor proposed jury admonitions and special jury instructions addressing the issue, and the trial court worked with both counsel when modifying the special jury instruction.  Consequently, defendant has forfeited any claim the jury admonition and the special jury instruction were incomplete on the grounds he now asserts on appeal.  (See *People v. Cleveland* (2004) 32 Cal.4th 704, 750 (*Cleveland*) [" '[a] party may not argue on appeal that an instruction correct in law was too general or incomplete, and thus needed clarification, without first requesting such clarification at trial' "].)  Even if the jury admonition and the special jury instruction suffer from the deficiencies as outlined by defendant, he has failed to demonstrate prejudice. As we have noted, the testimony of Rivas, Jorge, and Eleazar, was not outcome-determinative.  Consequently, on this record, we conclude any error in the jury admonition and the special jury instruction regarding the prosecution's late disclosure of the U-Visa applications was harmless applying any standard of review.  (*Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*); *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*).)  [FN23]

FN23.  Because we find no prejudicial error in the jury admonition and special jury instruction, we reject defendant's contention, made on direct appeal and in his petition for writ of habeas corpus, that his trial counsel was ineffective for failing to adequately object to the jury admonition and

> special jury instruction, inviting the court to submit a deficient special jury instruction, and failing to object on the ground that the special jury instruction violated defendant's constitutional rights to due process, a fair trial and equal protection under Article I of the California Constitution and the Fifth, Sixth and Fourteenth Amendments to the United States Constitution. (See *Strickland, supra,* 466 U.S. at p. 697 [claim of ineffective assistance of counsel may be resolved solely by "examining the prejudice suffered by the defendant as a result of the alleged deficiencies"]).

Pet. Exh. 1, at 11–23. This Court discusses the State Appellate Court's reasoned opinion below and finds that the State Appellate Court applied the correct precedent and did not unreasonably evaluate the facts. Accordingly, Petitioner cannot obtain habeas relief on Claims 2, 3, or 6.

### 1. *Brady* Violation (Claim 2)

Petitioner asserts that the Prosecution failed to timely disclose evidence of the U-Visa applications in bad faith (Pet. 32) and that it is reasonably probable those actions affected the outcome at trial (Pet. 35). As described above, the State Appellate Court rejected this claim on direct appeal because it found, after independently reviewing the U-Visa applications, that their late disclosure did not undermine confidence in the verdict. Pet. Exh. 1, at 19. This Court finds that the State Appellate Court was not unreasonable in arriving at its conclusion.

To start, the State Appellate Court applied the correct Supreme Court precedent set forth in *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny. *See* Pet. Exh. 1, at 19. Under *Brady*, "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. The prosecution must disclose such evidence even where the accused fails to request it. *United States v. Agurs*, 427 U.S. 97, 110 (1976).

In the context of an alleged *Brady* violation, "material" evidence is tantamount to "prejudicial," meaning "the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict." *Strickler v. Greene*, 527 U.S. 263, 281 (1999); *see also United States v Kohring*, 637 F.3d 895, 902 n.1 (9th Cir. 2011). A "reasonable probability" does not mean "more likely than not," but rather "that the likelihood of a different result is great enough to 'undermine confidence in the outcome of trial.'" *Smith v. Cain*, 565 U.S. 73, 75–76 (2012) (quoting *Kyles v. Whitley*, 514 U.S. 419, 434 (1995)). For this reason,

"evidence impeaching an eyewitness may not be material if the State's other evidence is strong enough to sustain confidence in the verdict." *Smith v. Cain*, 565 U.S. 73, 76 (2012).

In sum, there are three elements to a *Brady* violation: (1) "the evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching;" (2) "that evidence must have been suppressed by the State, either willfully or inadvertently"; and (3) "prejudice must have ensued."[7] *Strickler* 527 U.S. at 281–82; *see also United States v. Bagley*, 473 U.S. 667, 676 (1985).

Here, the State Appellate Court was not unreasonable in finding that the late disclosure of the U-Visa applications did not prejudice the outcome.[8] *See* Pet. Exh. 1, at 19; *see also Kyles*, 514 U.S. at 434; *Strickler* 527 U.S. at 281–82. The State Appellate Court concluded that "there was no material dispute as to the events that occurred before defendant disarmed the victim" and thus, the dispositive issue at trial was whether Petitioner acted in defense of self or others when he shot the Victim. Pet. Exh. 1, at 20. This defense primarily turned on whether Petitioner's actions were reasonable, which largely depended on whether the evidence showed he reasonably believed the Victim was reaching for a second gun in his waistband. *See* Pet. Exh. 1, at 20.

Petitioner asserts that statements on the U-Visa applications could have established that Thompkins was not the first aggressor. Pet. 35. But whether Petitioner's then-friend was the first aggressor did not pertain to whether the Victim was reaching for a second gun because other than Petitioner, no witness provided testimony to support this defense. *See* Pet. Exh. 1, at 20. The State Appellate Court independently reviewed both the unsealed and sealed portions of the U-Visa applications of Rivas, Jorge, and Eleazar, and concluded that they contained no discoverable information that was material to Petitioner's defense or relevant to the witnesses' memories of the

---

[7] Habeas relief is typically granted under the *Brecht* analysis, where alleged constitutional errors "had a substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (internal quotation marks omitted). That said, certain claims, such as an alleged *Brady* violation, are subject to their own harmless error standards, rendering the *Brecht* analysis unnecessary. *Jackson v. Brown*, 513 F.3d 1057, 1070 (9th Cir. 2008); *Kyles*, 514 U.S. at 435.

[8] Because this Court finds that the State Appellate Court was not unreasonable in concluding that the Prosecution's delayed disclosure did not prejudice the outcome, it does not evaluate the first and second prong of the *Brady* violation test. *See Strickler*, 527 U.S. at 281–82.

United States District Court
Northern District of California

incident. Pet. Exh. 1, at 15, n. 18. Moreover, as the State Appellate Court noted, there was no material dispute at trial as to the events that occurred *before* Petitioner disarmed the victim – instead, the dispositive issue at trial was whether petitioner acted in self-defense or defense of others when he fired the gun at the victim (based on the reasonableness of Petitioner's belief that the victim was reaching for a second gun as he ran away and after he fell to the ground). Pet. Exh. 1, at 19-20.

Petitioner further asserts that Jorge states in his U-Visa application that the victim "was moving when he was shot" by Petitioner – and argues that this statement "established that petitioner shot [the Victim] in self-defense." Pet. At 35. The State Appellate Court explained:

> In Jorge's U-Visa application, it was reported that Jorge saw a fight between a group of teenagers and "two couples . . . ." "One of the teenagers pulled out a handgun and one of the men in the second group began struggling with him to disarm him. The rest of the teenagers ran away, but the other man in the second group soon joined the struggle for the handgun. [¶] [Jorge] then heard a shot, he and his two co-workers ducked. When he raised his head again, he noticed that one of the men was now in possession of the handgun. A second shot was fired and [Jorge] saw the teenager trying to get up, but he was shot again."

Pet. Exh. 1, at 20, n. 19.

The State Appellate Court was not unreasonable in finding that Jorge's U-Visa application (and his statement that the Victim was trying to get up) does not provide support or otherwise corroborate Petitioner's claim that he fired the gun at the Victim because he reasonably believed the Victim was reaching for a second gun in his waistband. Pet. Exh. 1, at 20; *see also id.* n.19 ("Contrary to defendant's contention, Jorge's reported narrative does not corroborate defendant's testimony that the victim looked like he was reaching for a second gun, nor is the narrative otherwise 'material' as it does not 'tend in reason to prove that [defendant's] fear was reasonable' at the time he fired the gun while the victim was prone on the ground.") (internal citation omitted).

Moreover, in Petitioner's case, the Prosecution's late disclosure was made before trial ended, enabling the Trial Court to cure the error. Pet. Exh. 1, at 21–22. "*Brady* does not necessarily require that the prosecution turn over exculpatory material *before* trial. To escape the *Brady* sanction, disclosure 'must be made at a time when disclosure would be of value to the

accused.'" *United States v. Gordon*, 844 F.2d 1397, 1403 (9th Cir. 1988) (quoting *United States v. Davenport*, 753 F.2d 1460, 1462 (9th Cir. 1985). In *Gordon*, for example, the court found no *Brady* violation where visitor's logs were not disclosed until close of the government's case-in-chief on the grounds that the prosecution did turn over the documents, allowing the defense to re-call witnesses. *Id.* at 1402–03. The court found no due process violation because the defendants were able to use the documents and cure any prejudice caused by the delayed disclosure. *Id.* In contrast, in *Giglio* and *Cain*, the prosecution's misconduct was discovered *after* the jury verdict. *See Giglio v. United* States, 405 U.S. 150, 150–51 (1972); *Smith v. Cain*, 565 U.S. 73, 74–75 (2012).

Here, the Prosecution disclosed the U-Visa applications during trial when they were still of value to Petitioner's defense. Pet. Exh. 1, at 15–16. As the State Appellate Court highlighted, the Trial Court admonished the jury as to the Prosecution's delay in disclosure, made the three witnesses available for re-call by the defense, and provided a curative instruction at the end of trial. Pet. Exh. 1, at 21–22. The three witnesses returned to Court and the Trial Counsel recalled one witness (Rivas) to testify. Pet. Exh. 1, at 17. Petitioner acknowledges that there is no discussion on the record as to why Jorge and Eleazar were not recalled to testify. Pet. 30. Hence, any prejudice was cured during the proceedings. *See Gordon*, 844 F.2d at 1403.

Accordingly, the State Appellate Court's rejection of this claim was not an unreasonable application of Supreme Court precedent or based on an unreasonable determination of the facts in light of the evidence presented. 28 U.S.C. § 2254(d). Petitioner is not entitled to habeas relief on the claim for a *Brady* violation.

## 2. Trial Court's Refusal to Strike Evidence or Dismiss Charges (Claim 3)

Petitioner next asserts that the Trial Court erred in denying his motion to dismiss charges or to strike the testimony of Rivas, Jorge, and Eleazar in its entirety based on prosecutorial misconduct under California Penal Code § 1054.5. Pet. 47–52. Section 1054.5 permits a California trial court to order various sanctions for discovery violations. *See* Cal. Pen. Code § 1054.5. The State Appellate Court rejected Petitioner's claim on direct appeal, reasoning that the Trial Court ordered appropriate remedy. Pet. Exh. 1, at 21–22. This Court does not find that

the State Appellate Court's decision regarding this claim was unreasonable.  *See* 28 U.S.C. § 2254(d).

To start, federal habeas relief is generally unavailable for violations of or alleged error in the interpretation or application of state law.  *See Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991). So, to the extent that Petitioner disagrees with the decision not to strike the witnesses' testimony or dismiss the charges under § 1054, there is no basis for federal habeas relief.

Regardless, Cal. Pen. Code § 1054.5(c) states: "The court may prohibit the testimony of a witness pursuant to subdivision (b) [9] only if all other sanctions have been exhausted."  Here, the State Appellate Court evaluated the record and found that other appropriate sanctions were utilized – specifically, Petitioner received the pertinent portions of the U-Visa applications, the Trial Court offered a continuance, and the three witnesses were made available and Trial Counsel had the opportunity to recall them for further questioning.  *See* Pet. Exh. 1, at 22.

Accordingly, the State Appellate Court's rejection of this claim was not an unreasonable application of Supreme Court precedent or based on an unreasonable determination of the facts in light of the evidence presented.  28 U.S.C. § 2254(d).  Petitioner is not entitled to habeas relief on this claim.

### 3.  Trial Court's Admonishment and Curative Instruction (Claim 6)

Petitioner asserts that the Trial Court's "admonishment and instruction failed to accurately convey the importance of the prosecutor's misconduct."  Pet. 61.  Specifically, Petitioner attacks the Trial Court's failure to inform the jury that the Prosecution *willfully* failed to disclose evidence of the U-Visa applications and to explain why Jorge and Eleazar were not re-called to testify.[10]

---

[9] Cal. Pen. Code § 1054(b) states:  "Before a party may seek court enforcement of any of the disclosures required by this chapter, the party shall make an informal request of opposing counsel for the desired materials and information.  If within 15 days the opposing counsel fails to provide the materials and information requested, the party may seek a court order.  Upon a showing that a party has not complied with Section 1054.1 or 1054.3 and upon a showing that the moving party complied with the informal discovery procedure provided in this subdivision, a court may make any order necessary to enforce the provisions of this chapter, including, but not limited to, immediate disclosure, contempt proceedings, delaying or prohibiting the testimony of a witness or the presentation of real evidence, continuance of the matter, or any other lawful order.  Further, the court may advise the jury of any failure or refusal to disclose and of any untimely disclosure."

[10] Petitioner's focus on the Prosecution's alleged "intentional" conduct is misplaced.  *See* Pet. 61.

28

Pet. 62. Petitioner also claims that CALJIC No. 2.28 is "problematic" because it "invites jurors to speculate" by instructing the jury "to evaluate the weight and significance of a discovery violation without any guidance on how to do so." Pet. 62 (quoting *People v. Bell*, 118 Cal. App. 4th 249, 257 (2004)). Petitioner argues that the instruction failed to "inform the jury that they could make adverse findings against the prosecution due to their suppression of material evidence." Pet. 63.

The State Appellate Court rejected this claim because the record indicates that both the Prosecution and Trial Counsel worked with the Trial Court to issue the admonition – and thus petitioner forfeited any claim the jury admonishment and the special jury instruction were incomplete. *See* Pet. Exh. 1, at 22–23; *see also Donnelly v. DeChristoforo*, 416 U.S. 637, 644–45 (1974) (finding that a prosecutor's remarks were not sufficiently prejudicial to violate due process, in part because the court took special pains to issue a curative instruction). Moreover, the State Appellate Court also found that, regardless of any alleged deficiencies in the jury instructions, there was no demonstration of prejudice. *See* Pet. Exh. 1, at 23.

To obtain federal collateral relief for errors in the jury charge, a petitioner must show that the instruction by itself "so infected the entire trial that the resulting conviction violates due process." *Estelle*, 502 U.S. at 78; *Cupp v. Naughten*, 414 U.S. 141, 147 (1973); *see also Donnelly*, 416 U.S. at 643 ("[I]t must be established not merely that the instruction is undesirable, erroneous or even universally condemned, but that it violated some [constitutional right].") (internal quotation marks omitted). The instruction "may not be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record." *See Estelle*, 502 U.S. at 72 (internal citation and quotation marks omitted). In other words, the Court must evaluate jury instructions in the context of the overall charge to the jury and as a component of the entire trial process. *United States v. Frady*, 456 U.S. 152, 169 (1982) (citation omitted); *Prantil v. California*, 843 F.2d 314, 317 (9th Cir. 1988).

The relevant inquiry is "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a manner that prevents the consideration of constitutionally relevant

---

The key issue on collateral review is whether the trial error violated the Constitution, not whether the Prosecution's misconduct was willful or inadvertent. *See Strickler*, 527 U.S. at 281–82.

1  evidence." *Boyde v. California*, 494 U.S. 370, 380 (1990). That said, a determination that there is

2  a reasonable likelihood that the jury has applied the challenged instruction in a way that violates

3  the Constitution establishes only that an error has occurred. *See Calderon v. Coleman*, 525 U.S.

4  141, 146 (1998). If an error is found, the Court also must then determine that the error had a

5  substantial and injurious effect or influence in determining the jury's verdict before granting

6  habeas relief. *See Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993); *Calderon*, 525 U.S. at 146–

7  47.

8  Petitioner asserts that the jury instruction was problematic because it failed to convey the

9  extent to which the Prosecution's disclosure was delayed and because it invited the jury to

10  speculate about the significance of the violation. *See* Pet. 62–63. But, as previously discussed, the

11  State Appellate Court was not unreasonable in finding that the testimony of the three workers was

12  not outcome-determinative. *See* Pet. Exh. 1, at 23. Ultimately, the Prosecution's delay in

13  disclosure was revealed to the jury, and the Trial Court allowed Trial Counsel to re-call and

14  impeach the three workers. Pet. Exh. 1, at 17. The jury knew that the workers approached the

15  Prosecution about the U-Visa applications and that the applications provided an incentive to testify

16  against Petitioner. *See* Pet. Exh. 1, at 17.

17  Hence, based on the record, the State Appellate Court was not unreasonable in concluding

18  that any error in the jury admonishment and the special jury instruction regarding the late

19  disclosure of the U-Visa applications was harmless. *See* Pet. Exh. 1, at 23. This Court agrees

20  with the State Appellate Court that Petitioner fails to demonstrate prejudice, given the context of

21  the entire trial. *See Estelle*, 502 U.S. at 72, 78 (1991); *Donnelly*, 416 U.S. at 643; *see also*

22  *Calderon*, 525 U.S. at 146.

23  Based on the foregoing, the State Appellate Court's rejection of Claim 6 was not contrary

24  to, or involved an unreasonable application of, Supreme Court precedent or based on an

25  unreasonable determination of the facts given the evidence presented at trial. 28 U.S.C. § 2254(d).

26  Thus, Petitioner is not entitled to habeas relief on the instructional error claim.

27  **C. Excluded Evidence (Claims 7 & 8)**

28  Petitioner asserts two Trial Court errors with respect to the exclusion of evidence. First,

Petitioner argues that the Trial Court should have admitted evidence of the Victim's prior juvenile arrest for battery against a police officer. Pet. 65. Second, Petitioner argues that the Trial Court erroneously excluded his own excited statements, which support his theory of self-defense. Pet. 67. In both instances, Petitioner contends that the exclusion of such evidence prejudiced the verdict by depriving him of the opportunity to present a defense. *See* Pet. 66, 69.

Under the applicable federal law, "state and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials." *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006) (quoting *United States v. Scheffer*, 523 U.S. 303, 308 (1998)) (internal quotation marks omitted). As such, habeas relief is available to a prisoner in state custody only where the custody violates "the Constitution or laws or treaties of the United States." *See* 28 U.S.C. § 2254(a). In other words, "[a] federal court may not issue the writ on the basis of a perceived error of state law." *Pulley v. Harris*, 465 U.S. 37, 41 (1984); *see also Estelle*, 502 U.S. at 67–78. Instead, a state court's evidentiary ruling must violate federal law, either by infringing upon a specific federal constitutional or statutory provision or by depriving the defendant of the fundamentally fair trial guaranteed by due process. *Brown v. Paramo*, No. 17-cv-03948-JD, 2018 WL 3632042, at *5 (N.D. Cal. July 31, 2018); *see also Jammal v. Van de Kamp*, 926 F.2d 918, 919 (9th Cir. 2001) ("On federal habeas we may only consider whether the petitioner's conviction violated constitutional norms."). Hence, the issue for federal courts collaterally reviewing state evidentiary rulings is not whether the ruling violated state evidentiary principles, "but whether the trial court committed an error which rendered the trial so arbitrary and fundamentally unfair that it violated federal due process." *Jammal*, 926 F.2d at 920 (quoting *Reiger v. Christensen*, 789 F.2d 1425, 1430 (9th Cir. 1986)).

A defendant has a constitutional right to present a complete defense, which includes the right to present evidence such as witness testimony. *See Washington v. Texas*, 388 U.S. 14, 19 (1967). This right, however, is implicated only where the exclusion of the evidence (1) infringes upon "a weighty interest of the accused" and (2) is "arbitrary" or "disproportionate" to the purpose of the rule of evidence at issue. *Holmes*, 547 U.S. at 324; *see also Scheffer*, 523 U.S. at 308; *Rock v. Arkansas*, 483 U.S. 44, 58 (1987). The Supreme Court has occasionally held that the right to

31

present a complete defense was violated by excluding evidence under a state evidentiary rule, but such holdings are rare. *Nevada v. Jackson*, 569 U.S. 505, 509 (2013); *see, e.g., Holmes*, 547 U.S. at 331 (finding a violation where the rule itself did not rationally serve a legitimate end); *Rock*, 483 U.S. at 62 (finding that a *per se* rule excluding all posthypnosis testimony was infringing); *Chambers v. Mississippi*, 410 U.S. 284, 302–03 (1973) (concluding that "critical" hearsay evidence should not have been excluded where it "bore persuasive assurances of trustworthiness" and the State refused to permit the defendant to cross-examine a witness); *Washington v. Texas*, 388 U.S. 14, 23 (1967) (holding that the petitioner was denied due process where "the State arbitrarily denied him the right to put the witness on the stand, . . . whose testimony would have been relevant and material to the defense"). Furthermore, the alleged erroneous exclusion of evidence must result in actual prejudice, meaning a federal court has grave concerns that its exclusion "had a substantial and injurious effect or influence in determining the jury's verdict." *See Davis v. Ayala*, 135 S. Ct. 2187, 2197–98 (2015) (quoting *O'Neal v. McAninch*, 513 U.S. 432, 436 (1995)).

### 1. Prior Violent Acts (Claim 7)

Petitioner argues that the Trial Court's exclusion of the Victim's prior juvenile arrest for battery against a police officer was erroneous and prejudicial. Pet. 65-66. The State Appellate Court rejected this claim on direct appeal:

A. Relevant Facts

Before trial, the prosecutor filed a motion in limine, seeking to exclude the victim's prior acts of violence, including evidence of the commission of a battery on a peace officer (§ 243, subd. (b)), for which he was arrested but there was no juvenile adjudication. Relying on *People v. Tafoya* (2007) 42 Cal.4th 147, 165-166 (*Tafoya*), the prosecutor sought to exclude the evidence on the ground that although the victim committed an alleged act of violence and defendant might assert self-defense, there was no indication defendant knew the victim prior to the altercation. The trial court granted the prosecution's request to exclude the evidence after defense counsel submitted on the motion in limine without comment.

B. Analysis

Initially, we reject defendant's argument that the trial court failed, as a matter of law, to discharge its statutory duty under Evidence Code section 352, to weigh the probative value of the excluded evidence against its potential prejudice. "[T]he trial court ' "need not expressly weigh prejudice against probative value ... or even expressly state that [it] has done so...." ' " when it makes its rulings.

(*People v. Riel* (2000) 22 Cal.4th 1153, 1187 (*Riel*).)  In this case, the "record as a whole shows that the court was well aware of" the evidence that was sought to be excluded by the prosecution's motion in limine and ruled on the matter.  (*People v. Carpenter* (1999) 21 Cal.4th 1016, 1053.)

We also reject defendant's argument that a reversal is required because the trial court abused its discretion in excluding evidence of the victim's commission of a battery on a peace officer.  Defendant claims, for the first time on appeal, that the trial court erred in excluding the evidence based on *Tafoya.*  He properly concedes, however, that his appellate claim is forfeited because he failed to object on the ground now asserted on appeal.  (See Evid. Code, § 354 [exclusion of evidence]; *People v. Williams* (1998) 17 Cal.4th 148, 162, fn. 6 (*Williams*); *People v. Daniels* (2009) 176 Cal.App.4th 304, 320, fn. 10 (*Daniels*).)

In all events, reaching defendant's claim of error on the merits, we find no grounds for reversal.  As a preliminary matter, the record contains no evidence of the circumstances giving rise to the victim's arrest for battery on a peace officer.  Consequently, we cannot determine the probative value of such evidence.  Moreover, given the absence of any evidence that defendant was aware of the victim's purported character or reputation for committing violent acts, we question the probative value of the excluded evidence to assist the jury in resolving the dispositive issue, namely, defendant's claim that he reasonably believed the victim had a second gun.  We recognize that "Evidence Code section 352 must bow to the due process right of a defendant to a fair trial and to his right to present all relevant evidence of *significant* probative value to his defense."  (*People v. Reeder* (1978) 82 Cal.App.3d 543, 553.)  However, "this does not mean the trial court constitutionally was compelled to permit defendant to introduce all possibly relevant evidence on [an issue] despite its marginal relevance, the possible effect upon the jury's ability to remain focused on the issues before it (rather than becoming sidetracked on collateral questions) and the potentially significant amount of time entailed in admitting the evidence in a manner fair to both sides. [Citation.]" (*People v. Fuiava* (2012) 53 Cal.4th 622, 665, see *People v. Lawley* (2002) 27 Cal.4th 102, 155 (*Lawley*) ["[t]he general rule remains that ' "the ordinary rules of evidence do not impermissibly infringe on the accused's [constitutional] right to present a defense" ' "].)  On this record, we have no problem concluding that it is neither significantly likely nor reasonably probable defendant would have received more favorable verdicts if the jury had heard evidence that the victim had committed a battery on a peace officer.  Even if we assume the trial court erred in excluding the evidence, the error would be harmless applying any standard of review.  (*Chapman, supra,* 386 U.S. at p. 24; *Watson, supra,* 46 Cal.2d at p. 836).

Pet. Exh. 1, at 28–30.

Here, to the extent Petitioner argues that the Trial Court erroneously applied state evidentiary laws, collateral review is unavailable.  *See* Pet. 65–66; *see also Pulley*, 465 U.S. at 41; *Estelle*, 502 U.S. at 67–78.  With respect to the merits, the State Appellate Court applied the correct Supreme Court precedent in reaching its decision by evaluating whether the evidence was significant and resulted in an unfair result.  Pet. Exh. 1, at 29; *see also Jammal*, 926 F.2d at 920.  While the Supreme Court has not squarely addressed whether a state evidentiary rule precluding

33

evidence can violate a defendant's due process rights to present a defense, courts in this District and in the Ninth Circuit have found that petitioners bringing such a claim are not entitled to federal habeas relief. *See, e.g., Moses v. Payne*, 555 F.3d 742, 756, 58–59 (9th Cir. 2009) (finding no relief where expert testimony was excluded); *Paramo*, 2018 WL 3632042, at *7–9 (following *Moses* and finding that no clearly established law governing the petitioner's challenge to the decision to exclude the evidence of the victim's prior violent acts meant the defendant was not entitled to habeas relief); *Mendez v. Biter*, No. C 10-5555 PJH (PR), 2013 WL 843554, at *15 (N.D. Cal. Mar. 6, 2013) (same).

In any event, the State Appellate Court did not unreasonably apply controlling precedent to the facts. *See* 28 U.S.C. § 2254(d). The State Appellate Court concluded that the Trial Court's decision was not arbitrary, but rather that the Trial Court weighed the probative value of the evidence and rejected it based on its potential prejudicial effect. Pet. Exh. 1, at 28. California's evidentiary rules grant state courts discretion "to exclude evidence if its probative value is substantially outweighed by the probability that its admission will . . . create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." Cal. Evid. Code § 352. The State Appellate Court was not unreasonable in finding that the Trial Court did not abuse its discretion in excluding the evidence where it was based on an undeveloped record of the Victim's juvenile battery arrest and had little weight on Petitioner's ultimate interest of proving self-defense. Pet. Exh. 1, at 29; *see also Holmes*, 547 U.S. at 324.

Furthermore, this Court agrees that the exclusion of such evidence did not result in actual prejudice. *See Davis*, 135 S. Ct. at 2197–98; *Brecht*, 507 U.S. at 637. Petitioner presents no evidence that he knew the Victim before the shooting or that he was aware of the Victim's prior battery. Pet. 65–67; Pet. Exh. 1, at 29–30. For this reason, such evidence would not assist his claim that he acted in *reasonable* defense of self or others (*i.e.*, that the Victim was reaching for a second gun). *See* Pet. Exh. 1, at 29. Hence, the State Appellate Court reasonably concluded that it was neither likely no reasonably probable that Portioner would have received more favorable verdicts if the jury heard evidence that the Victim committed a battery on a peace officer. Pet. Exh. 1, at 29–30.

34

Accordingly, the State Appellate Court's analysis was not an unreasonable application of federal precedent or determination of facts. 28 U.S.C. § 2254(d). Thus, Petitioner is not entitled to habeas relief on the claim for excluded evidence of the Victim's prior acts.

### 2. Excited Statements (Claim 8)

Next, Petitioner argues that the Trial Court's exclusion of his own excited statements in the car was erroneous and prejudicial. Pet. 67, 69. The State Appellate Court rejected this claim on direct appeal:

> A. Relevant Facts
>
> During direct examination, Davis testified that immediately after she heard several gunshots, defendant returned to the car. Defendant was bleeding and said he had been shot. However, Davis did not remember any other conversation in the car. On cross-examination, defense counsel explored Davis's recollection of her conversation with defendant in the car. Davis repeated her previous testimony that a couple of seconds after defendant got into the car he immediately said he had been shot and he appeared in pain and upset. Defense counsel then asked, "And when he got in the car, he immediately said things like, 'They tried to kill us,' correct?" Davis replied, "Reading the transcript, I remember seeing that." [FN28] Defense counsel next asked, "He said things like, 'He almost shot you'; correct?" Before the witness could respond, the prosecutor objected on hearsay grounds, and the following colloquy between the court and counsel ensued:
>
> "The Court: Sustained.
>
> "[Defense Counsel]: Spontaneous statement, Your Honor. It's narrating or describing events that have just occurred.
>
> "The Court: Response?
>
> "[Prosecutor]: Your Honor, I don't think we know exactly how much time elapsed between the incident and these statements.
>
> "The Court: Sustained.
>
> "[Defense Counsel]: Your Honor, it also goes to state of mind. It's probative.
>
> "The Court: Sustained."
>
> Defense counsel then continued her questioning, asking Davis if defendant had made multiple statements when he got into the car. Davis replied, "Reading the statement, yeah." In response to further questions, Davis testified that at no point did defendant say anything about having a gun, and while she did not remember, she was "getting maybe" that defendant's main concern was he was shot.
>
> FN28. During the prosecution's direct examination of Davis, the witness testified she did not remember certain events. To refresh her memory,

35

Davis was asked to read to herself portions of the transcript of her testimony given at the preliminary hearing held a year after the shooting and a year before the trial. At the preliminary hearing, Davis testified that when defendant got into the car, "the only thing" she remembered was that defendant "kept saying ..., 'I got shot. Take me to the hospital. I can't believe this has happened. I got shot.'" When asked if she remembered telling the detectives that defendant said, 'He tried to kill us,'" Davis replied, "Kind of. Kind of just a little." As to these statements, Davis did not remember if defendant made the statements while he was in the car on the way to the hospital, but she did remember defendant saying "something of that nature."

B. Analysis

Defendant argues the trial court abused its discretion in excluding Davis' testimony that when defendant entered his companions' car after the incident he said, "[t]hey tried to kill us," and "[h]e almost shot you (referring to Thompkins)." [FN29] He contends the testimony should have been admitted under the "spontaneous statement" exception to the hearsay rule (Evid. Code, § 1240.) [FN30] We conclude defendant has failed to demonstrate any prejudicial error in the court's ruling.

FN29. As noted, the prosecutor made no objection to defense counsel's initial questions to Davis about defendant's statements made in the car after the incident, including whether defendant said, "'They tried to kill us.'" It was only in response to defense counsel's question ("He said things like, 'He almost shot you,' correct?"), that the prosecutor raised a hearsay objection and the court sustained it on the grounds that the statement was not admissible either as a spontaneous statement exception to the hearsay rule or as probative of defendant's state of mind. However, for the purposes of our discussion, we assume that, based on the colloquy in the record in which reference is made to the fact that defense counsel was seeking to elicit "statements" or a narration or description of "events that had just occurred," the jury could reasonably find that it was not to consider Davis' testimony concerning defendant's statements.

FN30. Defendant also argues Davis' testimony concerning his statements "should have been admitted to explain his state of mind during the shooting (i.e. good-faith belief in need for self-defense and defense of others)," citing to *People v. Hughey* (1987) 194 Cal.App.3d 1383 (*Hughey*). That case, however, concerns the admissibility of statements as spontaneous declarations under Evidence Code section 1240. (*Hughey, supra*, at p. 1388.) Although there is a "state of mind" exception to the hearsay rule (Evid. Code, §§ 1250, 1251, 1252), defendant makes no argument concerning that exception in his appellate briefs. In all events, it appears that Davis' testimony concerning defendant's statements would not have been admissible under the "state of mind" exception to the hearsay rule because the declarant has to be unavailable (before the statements can be admitted) and for purposes of that exception defendant is deemed an available witness. (Evid. Code, § 1251, subd. (a); see *People v. Ervine* (2009) 47 Cal.4th 745, 779, fn. 13.)

"In determining the admissibility of evidence, the trial court has broad discretion.... A trial court's ruling on admissibility implies whatever finding of fact is prerequisite thereto...." (*People v. Williams* (1997) 16 Cal.4th 153, 196.) "We review the trial court's conclusions regarding foundational facts for substantial

evidence. [Citation.] We review the trial court's ultimate ruling for an abuse of discretion [citations], reversing only if ' "the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." ' [Citation.]" (*People v. DeHoyos* (2013) 57 Cal.4th 79, 132.)

"Evidence Code section 1240 provides that '[e]vidence of a statement is not made inadmissible by the hearsay rule if the statement' '[p]urports to narrate, describe, or explain an act, condition, or event perceived by the declarant' and '[w]as made spontaneously while the declarant was under the stress of excitement caused by such perception.' ... [¶] 'To be admissible, "(1) there must be some occurrence startling enough to produce ... nervous excitement and render the utterance spontaneous and unreflecting; (2) the utterance must have been before there has been time to contrive and misrepresent, i.e., while the nervous excitement may be supposed still to dominate and the reflective powers to be yet in abeyance; and (3) the utterance must relate to the circumstance of the occurrence preceding it." ' [Citations.]" (*People v. Lynch* (2010) 50 Cal.4th 693, 751-752 (*Lynch*), overruled in part on another ground in *People v. McKinnon* (2011) 52 Cal.4th 610, 636-643.) "Because the second admissibility requirement, i.e., that the statement was made before there was ' "time to contrive and misrepresent," ' 'relates to the peculiar facts of the individual case more than the first or third does [citations], the discretion of the trial court is at its broadest when it determines whether this requirement is met.' [Citations.]" (*Lynch, supra*, at p. 752.)

As noted, the trial court here found there was an insufficient foundation for the admission of defendant's alleged statements as spontaneous declarations because there was no evidence regarding how soon after the shooting defendant made the statements sought to be admitted into evidence. Contrary to defendant's contention, whether defendant had sufficient time to "contrive and misrepresent" was a relevant factor in evaluating the spontaneity of his statements. (*Lynch, supra*, 50 Cal.4th at p. 752 [in evaluating mental state of declarant, the court should consider a number of factors including "length of time between the startling occurrence and the statement"].) Defendant's argument that the court failed to consider other factors in rendering its decision is forfeited as he did not asked the court to consider those factors or object to the court's ruling on the grounds he now asserts on appeal. (Evid. Code, § 354 [exclusion of evidence]; *Williams, supra,* 17 Cal.4th at p. 162, fn. 6; *Daniels, supra*, 176 Cal.App.4th at p. 320, fn. 10.) In all events, we conclude there is no merit to his argument. While defendant was in pain, having been shot in the leg, the record does not show, as a matter of law, that his physical condition "was such as would inhibit deliberation." (*People v. Raley* (1992) 2 Cal.4th 870, 894.) Despite being shot in the leg and bleeding, defendant, without any apparent difficulty, continued to struggle with the victim, disarmed the victim, and pursued the victim through the parking lot, firing several gunshots at the victim. After firing the last gunshot into the prone victim, defendant ran to his companions' car, having the presence of mind to take the gun. Additionally, the evidence does not establish, as a matter of law, that defendant's " 'reflective powers were still in abeyance' " at the time he made the self-serving statements in the car. (*Id.* at p. 893.) Rather, the evidence shows he had the presence of mind to make self-serving statements regarding the victim's conduct, designed to avoid apprehension for the shooting and to prevent his friends from reporting the matter to the authorities. Thus, on this record, we could not find, as a matter of law, that the court's exclusion of Davis' testimony concerning defendant's statements was an abuse of discretion.

Finally, we reject defendant's argument that he was prejudiced by the exclusion of Davis' testimony concerning his statements that he acted in self-

defense and defense of others. By its verdict of voluntary manslaughter, the jury clearly discredited defendant's testimony that he reasonably believed it was necessary to shoot the victim after defendant had disarmed him. We see nothing in the excluded evidence that would have lead the jury to believe that defendant acted reasonably when he shot at the victim after disarming him. Thus, even if the trial court erred in excluding evidence of defendant's statements, the error was harmless applying any standard of review. (*Chapman, supra,* 386 U.S. at p. 24; *Watson, supra*, 46 Cal.2d at p. 836). [FN31]

> FN31. Because we find no prejudicial error in the exclusion of evidence of defendant's statements, we reject his contention, made on direct appeal and in his petition for writ of habeas corpus, that his trial counsel was ineffective because she inadequately objected to the exclusion of the evidence and she failed to argue that the exclusion of the evidence would violate defendant's constitutional rights to due process, a fair trial, to present a defense and to equal protection under Article I of the California Constitution and the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution. (See *Strickland, supra*, 466 U.S. at p. 697 [claim of ineffective assistance of counsel may be resolved solely by "examining the prejudice suffered by the defendant as a result of the alleged deficiencies"].)

Pet. Exh. 1, at 30–34.

Here, to the extent Petitioner argues that the Trial Court erroneously applied state evidentiary laws, collateral review is unavailable. *See* Pet. 68; *see also Pulley*, 465 U.S. at 41; *Estelle*, 502 U.S. at 67–78. Courts in the Ninth Circuit have found that petitioners bringing claims on collateral review for the exclusion of evidence are not entitled to federal habeas relief. *See, e.g., Moses*, 555 F.3d at 58–59; *Paramo*, 2018 WL 3632042, at *7–9; *Mendez*, 2013 WL 843554, at *15.

Regardless, the State Appellate Court was not unreasonable in finding that the Trial Court did not abuse its discretion in excluding the evidence. *See* Pet. Exh. 1, at 33–34. Petitioner is correct that the mental state of the declarant is essential (Pet. 68) but the Trial Court was not required to admit evidence where Petitioner lacked foundation to establish his mental state. Pet. Exh. 1, at 33. The State Appellate Court affirmed Trial Court's finding that there was insufficient foundations for the admission of Petitioner's alleged statements as spontaneous declarations because there was no evidence in the record regarding how soon after the shooting Petitioner made those statements. *See* Pet. Exh. 1, at 33. The State Appellate Court was not unreasonable in finding that Petitioner failed to show that he had insufficient time to contrive the statements. *See* Pet. Exh. 1, at 33; *see also* Cal. Evid. Code § 1240. The decision was neither arbitrary or

disproportionate to § 1240. *See Holmes*, 547 U.S. at 324. And unlike *Chambers*, the record does not indicate that Petitioner's hearsay statements "bore persuasive assurances of trustworthiness." *Chambers*, 410 U.S. at 302–03.

Moreover, the State Appellate Court weighed the calculating decisions Petitioner made from the time of the fight to his arrest against the fact that event was sufficiently startling. Pet. Exh. 1, at 33–34. California's evidentiary rules grant trial courts broad discretion in determining the fact-intensive inquiry of whether sufficient time elapsed for a defendant to contrive and misrepresent his recollection of an event. *See People v. Lynch*, 50 Cal. 4th 693, 751–52 (2010), *overruled on other grounds* in *People v. McKinnon*, 52 Cal. 4th 610, 636-643 (2011); *see also* Pet. Exh. 1, at 32–33. The State Appellate Court did not unreasonably determine the facts and therefore was not unreasonable for finding that the Trial Court did not abuse its discretion.

More importantly, the State Appellate Court was not unreasonable in finding that the exclusion of such evidence was not prejudicial. *See* Pet. Exh. 1, at 34. Petitioner is correct that his statements in the car could support Petitioner's claim that he believed defense was required – but, as the State Appellate Court explained, his statements do not support that his belief was reasonable. *See* Pet. 69. By its verdict of "voluntary manslaughter," the jury clearly discredited Petitioner's version of events (*i.e.*, that he ***reasonably*** believed it was necessary to shoot the Victim after Petitioner had disarmed him). *See* Pet. Exh. 1, at 34. Thus, the State Appellate Court was not unreasonable in concluding that even if the Trial Court erred in excluding evidence of Petitioner's statements, the error was harmless because nothing in the excluded evidence would have led the jury to believe that Petitioner acted ***reasonably*** when he shot the Victim after disarming him. *See* Pet. Exh. 1, at 34.

In sum, the State Appellate Court's decision did not violate the standards of AEDPA. 28 U.S.C. § 2254(d). Thus, Petitioner is not entitled to habeas relief on the claim that the Trial Court erred in excluding evidence of Petitioner's alleged excited statements in the car.

### D. *Doyle* Error (Claim 9)

Because Petitioner invoked *Miranda* before officers could question him, Petitioner filed a motion *in limine* before trial, seeking an Evidence Code section 402 hearing regarding the

admissibility of any post-arrest statement made by Petitioner to Oakland Police Department homicide investigators. Pet. 70; RT Vol. 1 at 29, ECF 21-7. At a hearing on the motion, Prosecution argued that because Petitioner had invoked his *Miranda* rights, Prosecution did not intend to use Petitioner's statement unless Petitioner takes the stand and contradicts the statements he made to the officers. Pet. Exh. 1, at 23-24; RT Vol. 1 at 29-30, ECF 21-7. Based on the Prosecution's representation, the Trial Court tentatively deferred ruling on Petitioner's request for an Evidence Code section 402 hearing until the proffer of Petitioner's post-arrest statement. Pet. Exh. 1, at 24; RT Vol. 1 at 30, ECF 21-7. The Trial Court advised both counsel to "admonish" their witnesses regarding the court's *in limine* rulings. Pet. Exh. 1, at 24, RT Vol. 1 at 37, ECF 27-1.

While testifying, however, Sergeant Gantt mentioned Petitioner's interview and *Mirandization* of Petitioner in response to questions from Trial Counsel. Pet. 70–71. Petitioner asserts that Sergeant Gantt's reference to the interview impermissibly suggested that he "did not cooperate with police and reserved his story for trial." Pet. 72. He further contends that Sergeant Gantt's testimony was not harmless. Pet. 72. The State Appellate Court rejected this claim on direct appeal:

> III. Admission of Sergeant Gantt's Testimony in Purported Violation of Trial Court's In Limine Ruling and *Doyle v. Ohio* (1976) 426 U.S. 610 (*Doyle*) [FN24]
>
> FN24. In *Doyle, supra,* 426 U.S. 610, 619, the United States Supreme Court held that "the use for impeachment purposes of [a defendant's] silence, at the time of arrest and after receiving *Miranda* warnings, violate[s] the Due Process Clause of the Fourteenth Amendment." (See *Wainwright v. Greenfield* (1986) 474 U.S. 284, 292 ["[t]he point of the *Doyle* holding is that it is fundamentally unfair to promise an arrested person that his silence will not be used against him and thereafter to breach that promise by using the silence to impeach his trial testimony"].)
>
> A. Relevant Facts
>
> Before trial, defendant filed a motion *in limine* seeking an Evidence Code section 402 hearing regarding the admissibility of any postarrest statement made by defendant to Oakland Police Department homicide investigators. At a hearing on the motion, the prosecutor argued that "because defendant [had] invoked" his *Miranda* rights, the prosecutor "[did] not plan on using any portion of that statement at this time unless the defendant takes the stand and somehow contradicts the small passages that he did tell to the officers." In light of the prosecution's offer, the court tentatively deferred ruling on defendant's request for an Evidence

40

Code section 402 hearing until the proffer of defendant's postarrest statement. The court advised both counsel to "admonish" their witnesses regarding the court's in limine ruling.

During its case-in-chief, the prosecution questioned Oakland Police Sergeant James Gantt concerning his interviews with various percipient witnesses. Sergeant Gantt testified that he first questioned Davis about the incident. Davis admitted to the officer that she and defendant, Thompkins, and Broussard, had been at the taco food truck that night. A group of men arrived in the parking lot, and began to "mean mug" them by staring at them with menacing looks. Defendant engaged in a physical altercation with one of the men. When defendant grabbed the man in a bear hug, the man tried to pull out a gun, the men continued to struggle, and Davis heard a gunshot. She ran to the car and got into the front passenger seat, and then she heard more gunshots. Between five and ten seconds later, defendant and Thompkins got into the car. Davis and her friends ultimately went to a hospital in Tracy. They did not go to a nearby hospital because they were scared and did not "want it to come out about the little fight and altercation" they had at the taco food truck. Davis initially said the victim and one of his friends started shooting first. She later retracted her statement and said she did not see a gun or the shooting. When asked in a series of questions, who he next interviewed, Sergeant Gantt testified, "[d]efendant," and, then, Thompkins, Broussard, and the victim's friends. Sergeant Gantt was not questioned about the substance of the statements made by defendant or the other percipient witnesses.

On cross-examination, defense counsel questioned Sergeant Gantt about his interview with defendant in the following manner.

"[Defense Counsel]: Q. Sergeant Gantt, when you entered the interview room with Mr. Jones, did you get basic contact information from him: Name, address, phone number?

"A. Yes.

"Q. And other than that, you didn't conduct anything further than that; correct?

"A. I read him his rights.

"[Prosecutor]: Object at this point, Your Honor. Relevance."

"The Court: All right. Ladies and gentlemen, at this time we are going to take our afternoon recess...."

Outside the presence of the jury, the court told defense counsel that her questioning of Sergeant Gantt might lead the witness to proffer responses, which would infringe on defendant's right to remain silent in violation of the court's in limine ruling and *Doyle*. Defense counsel replied that her questions were meant to eliminate any concern the jurors might have that evidence of the substance of defendant's interview with Sergeant Gantt was being withheld from them. The court noted that defense counsel's last question to Sergeant Gantt "called for a yes or no response," and the witness volunteered more information than necessary. The court invited defense counsel to ask the court to give "some curative admonition" to the jury. When the trial resumed, defense counsel did not ask the court for the anticipated curative admonition. Nor did counsel further question Sergeant Gantt about his interview with defendant. At the conclusion of Sergeant Gantt's testimony, he was released subject to recall, but neither the prosecution nor defense

counsel recalled him as a witness. During closing arguments, the prosecutor did not ask the jury to consider or draw any inferences from Sergeant Gantt's testimony that he had interviewed defendant and read him his rights.

B. Analysis

Defendant argues he is entitled to a new trial because Sergeant Gantt's testimony (he interviewed defendant and read him his rights) violated the trial court's in limine ruling and *Doyle*. We disagree.

We initially conclude defendant's challenge to Sergeant Gantt's testimony that he interviewed defendant is forfeited as he failed to make either a timely objection or timely motion to strike the testimony in the trial court. "Evidence Code section 353, subdivision (a) allows a judgment to be reversed because of erroneous admission of evidence only if an objection to the evidence or a motion to strike it was 'timely made and so stated as to make clear the specific ground of the objection.' Pursuant to this statute, [it has been] ... ' "consistently held that the 'defendant's failure to make a timely and specific objection' on the ground asserted on appeal makes that ground not cognizable." ' [Citation.]" (*People v. Demetrulias* (2006) 39 Cal.4th 1, 20.) In all events, we reject defendant's argument that the prosecutor's question to Sergeant Gantt as to who he interviewed, "ran afoul of the trial court's [in limine] ruling by leading [the witness] to testify, 'I interviewed the defendant.' " "Although a prosecutor engages in misconduct by intentionally eliciting inadmissible testimony," the record here does not reflect the prosecutor intentionally solicited or anticipated that in response to his question as to who had been interviewed, Sergeant Gantt would respond that he interviewed defendant. (*People v. Valdez* (2004) 32 Cal.4th 73, 125; see *People v. Pinholster* (1992) 1 Cal.4th 865, 964-965 (*Pinholster*) [FN25] ["there is no indication the prosecutor purposely elicited the [complained of] responses; rather she was pursuing legitimate lines of inquiry"].)

FN25.  *Pinholster* was overruled in part on another ground in *People v. Williams* (2010) 49 Cal.4th 405, 459.

We also reject defendant's argument that a reversal is required based on Sergeant Gantt's revelation that he read defendant his rights. Defendant's objection at trial was premised on an argument that Sergeant Gantt's answer was "somewhat nonresponsive" to the question posed by defense counsel. Defendant never asked the court to rule on his appellate claim that the testimony violated the court's in limine ruling and *Doyle*. (*People v. Rogers* (1978) 21 Cal.3d 542, 548 ["questions relating to the admissibility of evidence will not be reviewed on appeal in the absence of a specific and timely objection in the trial court on the ground sought to be urged on appeal"].) More significantly, the trial court agreed that Sergeant Gantt's answer to the question was "nonresponsive," and invited defense counsel to request a curative admonition. Defense counsel never asked the court to strike the testimony and admonish the jury not to consider it. Consequently, defendant's claim of error is not cognizable on appeal. (See *People v. Jackson* (2014) 58 Cal.4th 724, 765 [court refused to review defendant's contention that prosecutor committed misconduct in eliciting certain testimony as defendant refused to accept trial court's offer to give proposed admonition that would have been more than sufficient to cure any possible harm].)

In all events, we see no merit to defendant's argument that he was prejudiced by those portions of Sergeant Gantt's testimony challenged on appeal. Sergeant Gantt did not testify that defendant had invoked his *Miranda* rights after the officer read him his rights. More importantly, during closing remarks the

prosecutor made no mention of Sergeant Gantt's testimony or defendant's *postarrest* silence, despite defendant's argument to the contrary. The prosecutor asked the jury to consider that defendant "had two years to think about this, ladies and gentlemen. Two years to come up with this story. If he cooked up a tale way back when this happened, what is to stop him from cooking up a tale now?" When read in context, it is apparent the prosecutor's quoted remarks were permissible references to defendant's *prearrest* explanations of how he got shot, which he told to hospital staff and a Tracy police officer who first responded to the hospital where defendant was being treated for his through-and-through gunshot wound to his leg. (See *People v. Champion* (2005) 134 Cal.App.4th 1440, 1448 ["[a]n assessment of whether the prosecutor made inappropriate use of defendant's postarrest silence requires consideration of the context of the prosecutor's ... argument"].) Thus, even if we assume the challenged portions of Sergeant Gantt's testimony should not have been admitted, the error would be harmless applying any standard of review. (*Chapman, supra,* 386 U.S. at p. 24; *Watson*, *supra*, 46 Cal.2d at p. 836.)

Pet. Exh. 1, at 23–27.

As a threshold matter, the State Appellate Court correctly identified and reasonably applied the Supreme Court precedent established under *Doyle* to assess this claim.[11]  *See* 28 U.S.C. § 2254(d).  *Doyle* holds that the Fourteenth Amendment does not permit a criminal defendant's post-*Miranda* silence during an arrest to be used against him for impeachment purposes.  *Doyle*, 426 U.S. at 619.  This holding "rests on the fundamental unfairness of implicitly assuring a suspect that his silence will not be used against him and then using his silence to impeach an explanation subsequently offered at trial."  *Brecht*, 507 U.S. at 628 (quoting *Wainwright v. Greenfield*, 474 U.S. 284, 291 (1986)) (internal quotation marks omitted).

The standard for overturning a conviction based on the prejudicial impact of a trial error under habeas review (*i.e.*, collateral review, as opposed to direct review) is not the harmless-error analysis set forth in *Chapman v. California*, 386 U.S. 18 (1967).[12]  *Brecht*, 507 U.S. at 622–23; *see also Fry v. Pliler*, 551 U.S. 112, 121–22 (2007) (holding that "in § 2254 proceedings a court

---

[11] Respondent argues that Petitioner has forfeited the *Doyle*-error claim because Trial Counsel failed to object or request a curative admonition.  *See* Resp. 41–43.  The State Appellate Court found in favor of this argument on direct review.  *See* Pet. Exh. 1, at 25–27.  The State Appellate Court also concluded that Sergeant Gantt's reference to the interview did not amount to prosecutorial misconduct because it did not appear that the Prosecution intentionally solicited or anticipated the remark.  Pet. Exh. 1, at 26; *see also* Pet. 72.  This Court need not address these arguments, however, as it decides the alleged *Doyle*-error claim on the merits.

[12] The State Appellate Court properly applied the standard set forth in *Chapman* because it reviewed Petitioner's *Doyle* claim on direct review.  *See* Pet. Exh. 1, at 2, 27, 51; *Brecht*, 507 U.S. at 622–23, 30–31 (1993).

43

must assess the prejudicial impact of constitutional error in a state-court trial under the 'substantial and injurious effect' standard set forth in *Brecht*"); *Cook v. Schriro*, 538 F.3d 1000, 1019 (9th Cir. 2008) (applying *Brecht* to a *Doyle* claim in a habeas petition). "Instead, the standard for determining whether habeas relief must be granted is whether the *Doyle* error 'had a substantial and injurious effect or influence in determining the jury's verdict.'" *Id.* at 623 (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)). Under this less onerous standard, "habeas petitioners may obtain plenary review of their constitutional claims, but they are not entitled to habeas relief based on trial error unless they can establish that it resulted in 'actual prejudice.'" *Brecht*, 507 U.S. at 637 (citing *United States v. Lane*, 474 U.S. 438, 449 (1986)). The Supreme Court has explained that the *Kotteakos* standard is "better tailored to the nature and purpose of collateral review," *Brecht*, 507 U.S. at 623, because "[t]he role of federal habeas proceedings, while important in assuring that constitutional rights are observed, is secondary and limited. Federal courts are not forums in which to relitigate state trials." *Id.* at 633 (quoting *Barefoot v. Estelle*, 463 U.S. 880, 887 (1983)) (internal quotation marks omitted).

Here, this Court agrees with the State Appellate Court that Sergeant Gantt's testimony did not prejudice the outcome of trial. *See* Pet. Exh. 1, at 27. Sergeant Gantt mentioned interviewing and *Mirandizing* Petitioner, but he did not elaborate that Petitioner invoked his rights. Pet. Exh. 1, at 27. During closing remarks, the Prosecution highlighted that Petitioner had several years to craft a story for trial. Pet. Exh. 1, at 27. As the State Appellate Court noted, however, such statements referred to Petitioner's *pre*-arrest explanations to doctors and police about how he was shot. Pet. Exh. 1, at 27. The Prosecution never further discussed Sergeant Gantt's testimony or Petitioner's *post*-arrest silence. Pet. Exh. 1, at 27. In other words, the Prosecution did not actually use Petitioner's post-arrest silence for impeachment purposes. *See Greer v. Miller*, 483 U.S. 756, 763–65 (1987) (distinguishing *use* of a defendant's post-arrest silence to impeach the defendant from a question that only touched upon it and finding no *Doyle* error where a defendant's post-arrest silence "was not submitted to the jury as evidence from which it was allowed to draw any permissible inference").

The State Appellate Court found that any impact Sergeant Gantt's statements had on the

trial outcome was harmless beyond a reasonable doubt.  *See* Pet. Exh. 1, at 27.  Under the less

onerous *Kotteakos* standard, this is especially true.  *See Kotteakos*, 328 U.S. at 776; *see also*

*Davis*, 135 S. Ct. at 2198 (explaining that "the *Brecht* standard "subsumes" the requirements that

§ 2254(d) imposes when a federal habeas petitioner contests a state court's determination that a

constitutional error was harmless under *Chapman*") (citing *Fry v. Pliler*, 551 U.S. 112 (2007)).

None of the statements the Petitioner complains of, considered in light of the entire trial

proceedings, "had a substantial and injurious effect or influence in determining the jury's verdict."

*See id.*

Accordingly, Petitioner has failed to show that the alleged *Doyle* error actually prejudiced

the jury verdict.  *See Brecht*, 507 U.S. at 637.  Based on the foregoing, the State Appellate Court's

analysis was not an unreasonable application of federal precedent or determination of facts.  28

U.S.C. § 2254(d).  Thus, Petitioner is not entitled to habeas relief on the *Doyle* error claim.

### E.  Alleged Prosecutorial Misconduct During Closing Statements (Claim 10)

Petitioner asserts that the Prosecution committed misconduct by highlighting in closing

rebuttal arguments that Petitioner failed to call Thompkins as a defense witness.  Pet. 73.

Petitioner argues that these statements effectively reduced the Prosecution's burden of proof by

inappropriately implying that Petitioner was required to call Thompkins to prove his innocence.

Pet. 74, 75.  The State Appellate Court rejected this claim on direct appeal:

A. Relevant Facts

The prosecution's pretrial witness list included Davis, Thompkins, and
Broussard, as witnesses for the People. Additionally, the prosecution filed several
motions in limine in anticipation that those witnesses would testify if called as
witnesses by the People. While the prosecution ultimately called Davis as a
witness, Thompkins and Broussard were not called as witnesses. As part of his
case, defendant did not call Thompkins or Broussard as witnesses.

During the trial held two years after the shooting, the jury heard testimony
from Davis and defendant, who each described defendant's personal relationships
with Davis, Thompkins, and Broussard, at the time of the shooting and at the time
of the trial. Defendant testified that at the time of the shooting, Davis was his
girlfriend, they were in love and had been living together for 10 months;
Thompkins was defendant's best friend, having grown up together; and Broussard
was Thompkins' girlfriend, whom defendant had known for five to six years. Davis
testified that by the time of the trial, she was no longer living with defendant and
she no longer had feelings for him. She did not consider defendant a friend because
she did not keep in touch with him. Since their break up defendant had made efforts

to keep in touch with Davis through phone calls and letters. Defendant testified he ended his relationship with Davis because Davis was attending school and the relationship "was putting a strain on her." Defendant no longer considered Davis a friend, but he held no ill will towards her. Defendant also testified his friendships with Thompkins and Broussard had changed. Defendant no longer saw or spoke with Thompkins by telephone, and defendant no longer saw Broussard. When asked if he had an issue with Thompkins, defendant replied, "Yeah. I do. I just felt like, you know, he could have [come] and told the truth."

In the prosecutor's closing rebuttal remarks, covering 50 pages of the reporter's transcript, he extensively addressed defendant's claim of self-defense and defense of others. On appeal defendant challenges certain portions of the prosecutor's closing remarks as follows (challenged portions are italicized):

[Prosecutor]: "The second reason to doubt the defendant's credibility, he concealed evidence in this case, ladies and gentlemen. [¶] The defense is making a big deal on how a trial is the process of having the truth come out, the truth come to light. Well, the defendant himself did not want the truth to come to light. He was the one who had the pistol that was used in shooting Anderson. He was the one who had the opportunity to turn the pistol into the authorities, but he didn't. He didn't, ladies and gentlemen. And he didn't ask anyone to do it on his behalf. And the reason why he didn't, ladies and gentlemen, is because he knew that that pistol would link him to the scene. He knew that if he was linked to the scene ..., he would have to face what he had done there—the same reason why he didn't call 9-1-1; the same reason why he cooked up a tale with Davis. [¶] And, ladies and gentlemen, he admitted to you that he had lied in the past about this very subject. About this very subject. *And not only did he lie once, but he tried to cover it up with his girlfriend. And that's significant, because he is not trying to get—he is not trying to fool himself, he is trying to make sure that others who had information who were at the scene, who probably saw what went down or at least heard what the defendant said about what went down, he wanted to make sure everyone was quiet. That's why Fred Tompkins, his best friend, is not here.*

"[Defense Counsel]: Objection.

"The Court: Comments of counsel are not evidence.

"[Prosecutor]: *If the defendant claims that he acted in self-defense and he told everyone he acted in self-defense in that car, and there were witnesses to testify to those observations, they would be here to testify.*

"[Defense Counsel]: Objection. Burden shifting.

"The Court: The comments of counsel are not evidence. You are to rely upon the evidence that you have received during the course of the trial.

"[The Prosecutor]: *Bottom line, ladies and gentlemen. Fred Thompkins is not here. Fred Thompkins is not here to testify. Fred Thompkins is no friend of the prosecution. Fred Thompkins is no friend of D'Mario Anderson. Fred Thompkins is the best friend of the defendant in this case.*" [FN32]

FN32. After the jury returned its verdict, defendant filed a motion for a new trial. He complained that the prosecutor had "continually entreated the jury to shift the burden of production of evidence to the defendant. On three consecutive instances, [the prosecutor], asked the jury to attribute his failure to call Fred Thompkins as a witness to the defendant." The prosecutor

46

opposed the motion, arguing that his closing remarks were permissible based on well-established case law. In denying defendant's motion for a new trial, the trial court commented on the unavailability of Thompkins in the following manner: "[T]he Court recognizes the flow of a trial, the ability to secure witnesses, and then the arguments that can be reasonably made based upon the absence of evidence." The court noted it had provided some additional remedies for the failure to call Thompkins as a witness to ensure that no hearsay statements attributed to Thompkins were inserted during the trial. The court's latter comment was apparently referring to defendant's pretrial supplemental motion in limine to exclude Hawkins' testimony that he heard Thompkins say, " 'Pull the trigger,' " "not 30 seconds" before defendant shot the victim while he was prone on the ground. After an Evidence Code section 402 hearing, and over the prosecution's objection, the court granted defendant's supplemental motion in limine, in part, by ruling that Hawkins would be permitted to testify he heard Thompkins "make a statement towards the defendant and the defendant then shot," but the content of Thompkins' statement was excluded as hearsay.

B. Analysis

" ' "A prosecutor's conduct violates the Fourteenth Amendment to the federal Constitution when it infects the trial with such unfairness as to make the conviction a denial of due process. Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves the use of deceptive or reprehensible methods to attempt to persuade either the trial court or the jury." [Citation.] When a claim of misconduct is based on the prosecutor's comments before the jury, as all of defendant's claims are, " 'the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion.' " [Citation.] To preserve a claim of prosecutorial misconduct for appeal, a defendant must make a timely and specific objection and ask the trial court to admonish the jury to disregard the improper argument. [Citation.]' [Citation.]" (*People v. Linton* (2013) 56 Cal.4th 1146, 1205 (*Linton*).)

Defendant argues the prosecutor committed prejudicial error by making remarks that defendant had the duty of producing Thompkins as a witness, and other remarks that were based on "facts not in evidence," "contrary to the facts in evidence;" and "contrary to his knowledge of what was true." However, in the trial court defendant did not object on the grounds he now asserts on appeal. He objected to the prosecutor's remarks solely on the ground that the prosecutor entreated the jury to engage in "burden shifting." Additionally, the trial court addressed defendant's objections, issuing admonitions to the jury that the prosecutor's remarks were not evidence and the jury was to rely on the evidence received during trial. Given the court's implicit sustaining of the objections, defense counsel was required to lodge a specific objection to preserve the claims of error defendant now asserts here. Because specific objections on the grounds now asserted on appeal "could easily have cured any harm, [defendant's] current claims are not cognizable on appeal. [Citation.]" (*Cleveland, supra*, 32 Cal.4th at p. 747; see *People v. Mayfield* (1993) 5 Cal.4th 142, 178 (*Mayfield*) [court is not required to address merits of prosecutorial error where defense "counsel did not object to the prosecutor's remarks and it appears that an admonition would have cured any potential harm"].)  [FN33]

FN33.  Defendant argues, in his direct appeal and in his petition for writ of habeas corpus, that his trial counsel was ineffective for inadequately objecting to the challenged remarks, failing to request an admonition to

some of the challenged remarks, and for failing to lodge an objection to other challenged remarks. However, "competent counsel may often choose to forgo even a valid objection. '[I]n the heat of a trial, defense counsel is best able to determine proper tactics in the light of the jury's apparent reaction to the proceedings. The choice of when to object is inherently a matter of trial tactics not ordinarily reviewable on appeal.' [Citation.]" (*Riel, supra*, 22 Cal.4th at p. 1197; see *United States v. Eaglin* (9th Cir. 1977) 571 F.2d 1069, 1087[defense counsel's failure to object could be explained on the ground that counsel "could have legitimately thought that an objection would have served only to draw further attention to the damaging statement while clearly not erasing its effect from the jurors' minds"].) In all events, as we later explain in the text of this opinion, defendant's claim of ineffective assistance of counsel fails as we find no prejudicial error in the prosecutor's closing remarks. (See *Strickland, supra*, 466 U.S. at p. 697 [claim of ineffective assistance of counsel may be resolved solely by "examining the prejudice suffered by the defendant as a result of the alleged deficiencies"].)

In all events, we see no merit to defendant's contention that the prosecutor's challenged remarks require reversal. It is well settled that a prosecutor is entitled to comment on the state of the evidence and a defendant's failure to call witnesses. (See *People v. Thomas* (2011) 51 Cal.4th 449, 491 [prosecutor did not commit error when he argued that "defendant's mitigating evidence was 'not very reliable' because the jury had not heard from the best witnesses on this point," "[y]ou would think that one of his brothers would come in to talk about him if there was something good to say about [defendant];" and "[i]f there were witnesses out there who had good things to say about [defendant], who could provide evidence that you could consider on his behalf, they would have been here"]; *People v. Bradford* (1997) 15 Cal.4th 1229, 1340 ["distinction clearly exists between the permissible comment that a defendant has not produced any evidence, and on the other hand an improper statement that a defendant has a duty or burden to produce evidence, or a duty or burden to prove his or her innocence"]; *People v. Ford* (1988) 45 Cal.3d 431, 435-436 [prosecutor's remark on defendant's failure to call codefendants to support his testimony was proper "[b]ecause defendant did not call the witnesses and the trial court did not determine that they could exercise their privilege against self-incrimination"]; *People v. Woods* (2006) 146 Cal.App.4th 106, 112 ["[c]omments on the state of the evidence or defense's failure to call logical witnesses, introduce material evidence, or rebut the People's case are generally permissible"]; *People v. Miller* (1961) 196 Cal.App.2d 171, 177 [prosecutor did not commit error when he argued defense could have subpoenaed witnesses, and defendant's testimony, if true, would have been substantiated, as "district attorney may comment upon the failure of the defendant to produce witnesses who would substantiate his evidence"]; see also *Rhoades v. Henry* (9th Cir. 2010) 598 F.3d 495, 511 [a "natural reading" of prosecutor's statement, " 'If there was evidence out there that would disassociate this gun from [the defendant], we'd have heard it,' " "is not that defendant didn't testify, but that there was no meaningful challenge to the government's evidence"].)

In this case, although the prosecutor's challenged remarks came in his rebuttal, the jury was well aware that neither the prosecution nor the defense had called Thompkins as a witness, that at the time of the shooting defendant and Thompkins had been best friends but by the time of the trial defendant was no longer friends with Thompkins, and defendant had explained that his issue with Thompkins was that Thompkins had apparently refused to come to court and tell the truth. The prosecutor's remarks that the jury had not heard evidence supporting defendant's testimony that "he had told his friends he had acted in self-defense"

was fair comment on the evidence, following an evidentiary ruling, which we have upheld. (See *Lawley, supra,* 27 Cal.4th at p. 156.) Consequently, we conclude "there was no misconduct and, contrary to defendant's claim, no miscarriage of justice" on this record. (*Ibid.*) *People v. Varona* (1983) 143 Cal.App.3d 566, cited by defendant, is "inapposite" as that case "involved *erroneous* evidentiary rulings on which the prosecutor improperly capitalized during his closing argument." (*Lawley, supra,* at p. 156; italics added.) Moreover, as we have noted, any potential for harm caused by the prosecutor's challenged remarks was cured by the court's admonition to the jury during the closing remarks. Later, in its closing instructions, the court again admonished the jury that counsel's remarks were not evidence and "[n]either side is required to call as witnesses all persons who may have been present at any of the events disclosed by the evidence or who may appear to have some knowledge of these events." (CALJIC Nos. 1.02 (Statements of Counsel); 2.11 (Production of All Available Evidence Not Required).) "We presume absent contrary indications that the jury was able to follow the court's instructions." (*Pinholster, supra,* 1 Cal.4th at p. 919.) Despite defendant's argument to the contrary, "[t]he court's instructions, not the prosecution's argument, are determinative, for '[w]e presume that jurors treat the court's instructions as a statement of the law by a judge, and the prosecutor's comments as words spoken by an advocate in an attempt to persuade.' [Citation.] Given the instructions provided here, we discern no reasonable likelihood [citation] that the prosecutor's [challenged remarks] would have misled the jury...." (*Mayfield, supra,* 5 Cal.4th at p. 179.) [FN34]

> FN34. We decline defendant's suggestion that we consider whether the prosecutor's challenged remarks resulted in prejudicial error based on statements allegedly made by some of the jurors after rendering their verdict. In a footnote in his motion for a new trial, defendant informed the trial court that "[a]fter the verdict, discussions with jurors revealed that at least some jurors adopted the prosecution's position that the burden to produce Fred Thompkins was defendant's. Juror #5 specifically, stated that defendant's failure to produce Fred Thompkins as a witness went to defendant's 'credibility.' " However, the jurors' reported statements were not evidence the jury ever discussed defendant's failure to call Thompkins as a witness. (*Demirdjian v. Gipson* (9th Cir. 2016) 832 F.3d 1060 [2016 U.S. App. Lexis 14688, *35, 2016 WL 4205938] [statements by jurors to reporters (one juror thought jury should have heard from defendant, and another juror was persuaded to change her vote from not guilty to guilty because of defendant's failure to testify), were not evidence the jurors ever discussed defendant's silence].)

Pet. Exh. 1, at 34–40.

To start, the State Appellate Court applied the correct Supreme Court precedent. *See* Pet. Exh. 1, at 37 (quoting *People v. Linton*, 56 Cal. 4th 1146, 1205 (2013)). "[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219 (1982). Hence, the relevant question in assessing allegations of prosecutorial misconduct is "whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden v. Wainwright*, 477 U.S. 168, 182 (1986) (quoting *Donnelly*, 416 v. U.S. at

643); *see also Parker v. Matthews*, 567 U.S. 37, 45 (2012) (per curiam) (explaining that *Darden* represents the clearly established federal law governing a prosecutor's alleged improper remarks during closing argument); *cf. Linton*, 56 Cal. 4th at 1205 ("A prosecutor's conduct violates the Fourteenth Amendment to the federal Constitution when it infects the trial with such unfairness as to make the conviction a denial of due process."). Where a defendant contends that a prosecutor's remarks rendered his trial fundamentally unfair, the remark must be examined within the context of the entire trial. *See Greer*, 483 U.S. at 766–67.

For habeas petitions the standard of review for such claims is "the narrow one of due process, and not the broad exercise of supervisory power." *Darden*, 477 U.S. at 181 (quoting *Donnelly*, 416 U.S. at 642) (internal quotation marks omitted). As such, it is insufficient to show "that the prosecutor's remarks were undesirable or even universally condemned." *Darden*, 477 U.S. at 181. Instead, "[o]n habeas review, constitutional errors of the 'trial type,' including prosecutorial misconduct, warrant relief only if they 'had substantial and injurious effect or influence in determining the jury's verdict.'" *Wood v. Ryan*, 693 F.3d 1104, 1113 (9th Cir. 2012) (quoting *Brecht*, 507 U.S. at 637–38).

Here, the State Appellate Court was not unreasonable in finding that the Prosecution's comments were permissible comments on the state of the evidence.[13] Pet. Exh. 1, at 38. "A prosecutor may properly comment upon a defendant's failure to present witnesses so long as it is not phrased as to call attention to the defendant's own failure to testify." *United States v. Fleishman*, 684 F.2d 1329, 1343 (9th Cir. 1982), *cert. denied*, 459 U.S. 1044 (1982), *implied overruling on other grounds recognized by U.S. v. Ibarra-Alcarez*, 830 F.2d 968, 973 n.1 (9th Cir. 1987); *see also Rhoades v. Henry*, 598 F.3d 495, 511 (9th Cir. 2010) (finding that the prosecutor's comment, "[i]f there was evidence out there . . . we'd have heard it," naturally suggested the defense failed to challenge the state's evidence meaningfully); *United States v. Cabrera*, 201 F.3d 1243, 1250 (9th Cir. 2000) (finding that "[a] prosecutor's comments on a defendant's failure to

---

[13] The State Appellate Court also concluded that this argument was forfeited for Trial Counsel's failure to raise proper objections. Pet. Exh. 1, at 37–38. Because the Court decides this issue on the merits, it does not address this issue.

call a witness does not shift the burden of proof, and is therefore permissible, so long as the prosecutor does not violate the defendant's Fifth Amendment rights by commenting on the defendant's failure to testify"). Here, Petitioner did testify, undermining Petitioner's claim that the Prosecution's comments somehow reduced Petitioner's burden of proof. *See* Pet. 74; Pet. Exh. 1, at 35; *see also Cabrera*, 201 F.3d at 1250.

Regardless, the State Appellate Court was not unreasonable in determining that any error in the Prosecution's comments did not prejudice the outcome of the trial. By the time the Prosecution made the challenged remarks during rebuttal closing arguments, the jury knew about the nature of Thompkins' and Petitioner's relationship (that Thompkins and Petitioner were best friends, but by the time of trial Thompkins and Petitioner were no longer friends) and Petitioner explained that Thompkins had "apparently refused to come to court and tell the truth." Pet. Exh. 1, at 39. The jury was also well aware that Thompkins did not testify for Petitioner or the Prosecution. Pet. Exh. 1, at 39. Therefore, it cannot be said that the Prosecution's comments "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 637–38.

Also, given that Petitioner put Thompkins' failure to appear at issue during his testimony, it was not unreasonable for the State Appellate Court to conclude that the Prosecution's statements constituted "a fair comment on the evidence." Pet. Exh. 1, at 39–40; *see also United States v. Mares*, 940 F.2d 455, 461 (9th Cir. 1991) (finding that comments highlighting a failure to present evidence did not shift the burden of proof but rather challenged the other side "to explain to the jury uncomfortable facts and inferences").

Furthermore, the Trial Court issued several curative jury instructions. Pet. Exh. 1, at 40. The Supreme Court has found no due process violation where the trial court "cured any possible error by sustaining the defendants' objections . . . and immediately admonishing the jury that the defense was not required to produce any witnesses or evidence." *United States v. Fagan*, 996 F.2d 1009, 1016 n.7 (9th Cir. 1993). And courts "normally presume that a jury will follow an instruction . . . unless there is an overwhelming probability that the jury will be unable to follow the court's instructions and a strong likelihood that the effect . . . would be devastating to the

defendant." *Greer*, 483 U.S. at 767 n.8 (internal citations and quotation marks omitted); *see also Fleishman*, 684 F.2d at 1344 (finding that the trial court's instructions were sufficient to cure any impermissible shifting of the burden of proof that may have occurred). Hence, it cannot be said that the State Appellate Court was unreasonable in finding that "any potential for harm caused by the prosecutor's challenged remarks was cured by the court's admonition to the jury during the closing remarks . . . [and] in its closing instructions." Pet. Exh. 1, at 40. Likewise, in light of the lack of prejudice, the curative instructions, and other evidence presented at trial, the State Appellate Court was not unreasonable in determining that the trial as a whole was not unfair. *See Darden*, 477 U.S. at 182–82 (finding that, while the "trial was not perfect—few are—but neither was it fundamentally unfair").

Based on the foregoing, the State Appellate Court's rejection of this claim did not result in a decision that was contrary to or involved an unreasonable application of Supreme Court precedent and nor was it based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. 28 U.S.C. § 2254(d). Petitioner is not entitled to habeas relief on his charge of prosecutorial misconduct with respect to the closing rebuttal statements.

### F. Ineffective Counsel (Claims 4, 5, 6, 7, 10, & 11)

Petitioner cites various instances of ineffective counsel that he argues warrant habeas relief, including (1) inadequately handling the Trial Court's admonishment and jury instructions provided to cure the Prosecution's alleged *Brady* violation; (2) failing to produce material evidence of the three workers' testimony; (3) inadequately objecting to the Trial Court's exclusion of evidence; (4) inadequately objecting to the officer's testimony about *Mirandizing* Petitioner; (5) failing to call Thompkins as a witness; (6) inadequately objecting to the Prosecution's rebuttal statements during closing arguments; and (7) inadequately objecting to the alleged Trial Court errors during sentencing. Pet. 79–82.

The Sixth Amendment recognizes that a criminal defendant has the right to effective assistance of counsel. *See Strickland v. Washington*, 466 U.S. 668, 685–86 (1984). The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so

undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result. *Id.* at 686.

To prevail on an ineffective counsel claim, a petitioner must make two showings: (1) deficiency and (2) prejudice. *Id.* at 687. First, petitioner must show that counsel's performance was deficient such that it fell below an "objective standard of reasonableness . . . under prevailing professional norms." *Strickland*, 466 U.S. at 687–88. Second, counsel's deficient performance must have prejudiced the petitioner's case, meaning "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

A "doubly" deferential judicial review is appropriate in analyzing ineffective assistance of counsel claims under § 2254. *See Cullen v. Pinholster*, 563 U.S. 170, 202 (2011); *Harrington*, 562 U.S. at 105; *Premo v. Moore*, 562 U.S. 115, 122–23 (2011). The general rule of *Strickland* affords counsel's effectiveness great deference. 466 U.S. at 689. Hence, state courts have greater leeway in reasonably applying it, which "translates to a narrower range of decisions that are objectively unreasonable under AEDPA." *Cheney v. Washington*, 614 F.3d 987, 995 (9th Cir. 2010) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). When § 2254(d) applies, the question for the Court is not simply whether counsel's actions were reasonable, but rather "whether there is *any* reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Harrington*, 562 U.S. at 105 (emphasis added).

In reviewing Petitioner's ineffective assistance of counsel claims on direct appeal, the State Appellate Court correctly identified and reasonably applied the following federal legal principles set forth in *Strickland*:

> Defendant also seeks habeas relief on the ground that he was prejudiced by certain acts or omissions of his trial counsel. However, "[i]n order to establish a violation of the right to effective assistance of counsel, a defendant must show that counsel's performance was inadequate when measured against the standard of a reasonably competent attorney, and that counsel's performance prejudiced defendant's case in such a manner that his representation 'so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.' [Citation.] Moreover, [as we have noted], 'a court need not determine whether counsel's performance was deficient before examining the

prejudice suffered by the defendant as a result of the alleged deficiencies.' [Citation.]  Prejudice is shown when there is a 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome.' [Citations.]  If defendant fails to show that he was prejudiced by counsel's performance, we may reject his ineffective assistance claim without determining whether counsel's performance was inadequate.  [Citation.]" (*People v. Sanchez* (1995) 12 Cal.4th 1, 40-41, disapproved in part on another ground in *Doolin*, *supra*, 45 Cal.4th at p. 421, fn. 22.)[14]

Pet. Exh. 1, at 49; *see also* Pet. Exh. 1, 22 n.22, 23 n.23, 27 n.26, 30 n.27, 34 n.31, 38 n.33, 48 n.39; *see also* 29 U.S.C. § 2254(d).  Each of Petitioner's claims for ineffective counsel is discussed in turn below.

### 1. *Brady* Violation

In Claim 6, Petitioner asserts that Trial Counsel was ineffective for failing to object to certain deficiencies in the Trial Court's admonishment to the jury regarding the U-Visa applications and its use of CALJIC No. 2.28 as a jury instruction.  Pet. 64.  Specifically, Petitioner complains that the admonishment and instruction "did not direct the jury to 'consider that concealment and delayed disclosure in determining the believability or weight to be given to the particular evidence.'"  Pet. 64 (quoting CALJIC No. 2.28).  According to Petitioner, Trial Counsel should have objected when the Trial Court did not instruct the jury as to the dates surrounding the parties' knowledge of the witnesses' request for U-Visas and should have further objected on constitutional grounds.  Pet. 64–65.  The State Appellate Court reviewed the evidence as follows:

> Because we find no prejudicial error in the jury admonition and special jury instruction, we reject defendant's contention, made on direct appeal and in his petition for writ of habeas corpus, that his trial counsel was ineffective for failing to adequately object to the jury admonition and special jury instruction, inviting the court to submit a deficient special jury instruction, and failing to object on the ground that the special jury instruction violated defendant's constitutional rights to due process, a fair trial and equal protection under Article I of the California Constitution and the Fifth, Sixth and Fourteenth Amendments to the United States Constitution. (See *Strickland*, *supra*, 466 U.S. at p. 697 [claim of ineffective assistance of counsel may be resolved solely by "examining the prejudice suffered by the defendant as a result of the alleged deficiencies"] ).

Pet. Exh. 1, at 23 n.23.

The State Appellate Court was not unreasonable in its assessment of the Trial Court's

---

[14] The State Appellate Court's standard cites *Sanchez*, 12 Cal. 4th at 40–41, which relies almost entirely on *Strickland*, 466 U.S. at 668, 686, 94, 97 (1984).  Pet. Exh. 1, at 49.

curative admonishment and use of CALJIC No. 2.28.  *See* 28 U.S.C. § 2254(d).  Upon an extensive review of the facts surrounding the late disclosure of the U-Visa applications and its impact on the jury's decision, the State Appellate Court concluded that "[e]ven if the jury admonition and special jury instruction suffer from the deficiencies as outlined by [Petitioner], he has failed to demonstrate prejudice."  Pet. Exh. 1, at 23.

This Court agrees.  To start, the Trial Court's curative instructions apprised the jury of the late disclosure and explained how the U-Visa applications affected the weight of the three workers' testimony.  *See* Pet. Exh. 1, at 18.  Moreover, the three workers' testimony offered little as to the ultimate issue at trial—whether Petitioner acted reasonably in shooting the Victim.  *See* Pet. Exh. 1, at 21, 23.  Accordingly, a "doubly" deferential judicial review establishes that the State Appellate Court's rejection of Petitioner's claim for ineffective counsel was likewise not unreasonable.  *See Cullen*, 563 U.S. at 202.

The State Appellate Court did not unreasonably apply the proper law to Trial Counsel's representation with respect to the U-Visa applications. 28 U.S.C. § 2254(d).  Thus, Petitioner is not entitled to habeas relief on this claim.

## 2.  Material Witness Testimony

Petitioner next asserts that Trial Counsel failed to introduce material and exculpatory evidence regarding the three workers' U-Visa applications.  Pet. 52, 79–80.  Specifically, Petitioner argues that "[r]easonably effective counsel would have recalled all three witnesses and examined them about the material evidence in the U-Visa applications, or sought a continuance and renewed the motion to dismiss if the witnesses were not available."  Pet. 56.  The State Appellate Court reviewed the evidence as follows:

> Defendant complains, on his direct appeal and in his petition for writ of habeas corpus, that his trial counsel was ineffective for failing to request a continuance, failing to question Rivas about the narrative of the incident reported in his U-Visa application, failing to renew the motion to strike the testimony of Eleazar and Jorge when those witnesses were unavailable to testify, and, assuming Eleazar and Jorge were available to testify, failing to recall them as witnesses because their testimony "would have been material, necessary and admissible," and failing to introduce all material evidence contained in the U-Visa applications concerning " the witnesses' immigration status, PTSD, and recollection of the shooting." However, defendant has failed to demonstrate that either a continuance, or the exculpatory or impeachment evidence that counsel could have revealed by

the admission of the redacted U-Visa applications and further questioning of the witnesses, "would have produced a more favorable result at trial." (*People v. Cox* (1991) 53 Cal.3d 618, 662, disapproved in part on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22 (*Doolin*).) (See *Strickland v. Washington* (1984) 466 U.S. 668, 697 (*Strickland*) [claim of ineffective assistance of counsel may be resolved solely by "examining the prejudice suffered by the defendant as a result of the alleged deficiencies"].)

Pet. Exh. 1, at 22 n.22. In other words, the State Appellate Court found, and this Court agrees (as discussed in detail above), that Petitioner failed to establish prejudice based on the delayed disclosure of the U-Visa applications. *See* Pet. Exh. 1 at 50. Here, under the "doubly" deferential judicial review, this Court finds that the State Appellate Court's rejection of this claim was not based on an unreasonable application of *Strickland. See Cullen*, 563 U.S. at 202; *Harrington*, 562 U.S. 86, 105 (2011); *Premo v. Moore*, 562 U.S. 115, 122–23 (2011).

Petitioner alternatively argues that Trial Counsel could have questioned the three workers about their legal status to impeach them. Pet. 54–55. But even if such information were relevant to the weight of their testimony, the State Appellate Court was not unreasonable in determining that it did not prejudice the outcome. *See Strickland*, 466 U.S. at 697. Trial Counsel briefly questioned Rivas about his immigration status at the outset, during which time Rivas confirmed that he sought a signed affidavit from the District Attorney's office in exchange for cooperating as a witness for the prosecution. Pet. Exh. 1, at 14. Furthermore, after discussing the matter outside the presence of the jury, the Trial Court admonished the jury as to the U-Visa applications and the implications of their existence. Pet. Exh. 1, at 16–17. Then, Trial Counsel recalled Rivas and questioned him further about his immigration status and the importance of obtaining legal status to him and his family. Pet. Exh. 1, at 17.

The same conclusion applies to Petitioner's contention that evidence regarding the workers' PTSD could have been used to question their memories of the event. Pet. 55. The State Appellate Court independently reviewed the sealed records concluded they contained no discoverable information that is material to Petitioner's defense or relevant to the witnesses' memories of the incident. Pet. Exh. 1, at 15, n. 18. And the Trial Court included as part of its admonishment to the jury that the witnesses' psychological evaluations included in their U-Visa applications. Pet. Exh. 1, at 17.

Finally, Petitioner claims that Jorge could have testified that he saw the Victim "trying to get up" after the first few shots were fired. Pet. 54; Pet. Exh. 16, at 250, ¶ 11. But, as the State Appellate Court explained, there was no prejudice because nothing in the record indicates that Jorge could corroborate Petitioner's testimony on the key issues at trial – namely, that the Victim appeared to be reaching for a gun or that Petitioner's fear was reasonable when he fired the gun at the prone Victim. *See* Pet. Exh. 1, at 20 n.19.

Accordingly, after conducting a "doubly" deferential judicial review, this Court finds that the State Appellate Court's rejection of this claim was neither an unreasonable application of Supreme Court precedent nor an unreasonable determination of the facts given the evidence. *See Cullen*, 563 U.S. at 202; 28 U.S.C. § 2254(d). Thus, Petitioner is not entitled to habeas relief on his claim for ineffective counsel in handling the U-Visa applications.

### 3. Exclusion of Evidence

Petitioner first asserts that Trial Counsel should have objected to the Trial Court's exclusion of evidence that the Victim previously committed battery against a police officer based on constitutional grounds. Pet. 67, 80. According to Petitioner, such specific acts of aggression should have been admissible to show that the Victim was the aggressor and that the homicide was therefore justified. Pet. 80. The State Appellate Court reviewed the evidence as follows:

> Because we find no prejudicial error in the exclusion of evidence of the victim's prior act of violence, we reject defendant's contention, made on direct appeal and in his petition for writ of habeas corpus, that his trial counsel was ineffective because she failed to make an appropriate objection (by distinguishing *Tafoya* and citing to other cases in support of the admission of the evidence), or otherwise argue that the exclusion of the evidence would violate defendant's constitutional rights to due process, a fair trial, to present a defense and to equal protection under Article I of the California Constitution and the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution. (See *Strickland, supra*, 466 U.S. at p. 697 [claim of ineffective assistance of counsel may be resolved solely by "examining the prejudice suffered by the defendant as a result of the alleged deficiencies"].)

Pet. Exh. 1, at 30 n.27.

Here, as explained above, the State Appellate Court concluded on the merits that exclusion of the Victim's battery on a police officer likely had no prejudicial effect on the jury verdict. Pet. Exh. 1, at 29–30. This Court agrees. There was no evidence that Petitioner knew about the

Victim's past aggressive act, meaning it did not bear on Petitioner's decision to shoot the Victim. Pet. Exh. 1, at 29. Petitioner claims that he acted on both actual and reasonable belief of imminent danger because of the events surrounding the homicide, not because the Victim's past conduct. *See* Pet. 21–24. The jury, therefore, likely would have decided no differently as to whether Petitioner's actions were justified. *See Strickland*, 466 U.S. at 697; *Brecht*, 507 U.S. at 637–38.

Second, Petitioner claims that Trial Counsel should have objected on constitutional grounds to the exclusion of Petitioner's excited statements in the car. Pet. 69, 80–81. The State Appellate Court reviewed the evidence in similar fashion to the first evidentiary claim:

> Because we find no prejudicial error in the exclusion of evidence of defendant's statements, we reject his contention, made on direct appeal and in his petition for writ of habeas corpus, that his trial counsel was ineffective because she inadequately objected to the exclusion of the evidence and she failed to argue that the exclusion of the evidence would violate defendant's constitutional rights to due process, a fair trial, to present a defense and to equal protection under Article I of the California Constitution and the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution. (See *Strickland, supra*, 466 U.S. at p. 697 [claim of ineffective assistance of counsel may be resolved solely by "examining the prejudice suffered by the defendant as a result of the alleged deficiencies"].)

Pet. Exh. 1, at 34 n.31.

First, as discussed above, the State Appellate Court was not unreasonable in affirming the Trial Court's decision that there was insufficient foundation for the admission of Petitioner's alleged statements as spontaneous declarations because (1) there was no evidence regarding how soon after the shooting defendant made the statements and (2) Petitioner's actions after the fight demonstrated his presence of mind. *See* Pet. Exh. 1, at 33-34. Second, this Court agrees with the State Appellate Court that by its verdict of "voluntary manslaughter," the jury clearly discredited Petitioner's testimony that he reasonably believed it was necessary to shoot the victim after Petitioner had disarmed him. Pet. Exh. 1, at 34. Consequently, the State Appellate Court was not unreasonable in concluding that the jury likely still would have found voluntary manslaughter, meaning that neither excluding the evidence nor failing to object on constitutional grounds prejudiced the outcome. *See* Pet. Exh. 1, at 34; *see also Strickland*, 466 U.S. at 697; *Brecht*, 507 U.S. at 637–38.

This Court reviews these claims for ineffective counsel as to the excluded evidence with

double deference. *See Cullen*, 563 U.S. at 202. The State Appellate Court found no harm resulting from both exclusions. Pet. Exh. 1, at 29–30, 34. Accordingly, Trial Counsel's failure to object to both evidentiary exclusions based on constitutional grounds was not also not prejudicial. Pet. Exh. 1, at 30 n.27, 34 n.31. Thus, because State Appellate Court's rejection of both claims was not an unreasonable, Petitioner is not entitled to habeas relief as to them. 28 U.S.C. § 2254(d).

### 4. *Doyle* Error

Before trial, Petitioner filed a motion *in limine* seeking an Evidence Code section 402 hearing regarding the admissibility of any post-arrest statement made by Petitioner to Oakland Police Department homicide investigators. Pet. 70; RT Vol. 1 at 29, ECF 21-7. At a hearing on the motion, Prosecution argued that because Petitioner had invoked his *Miranda* rights, Prosecution did not intend to use Petitioner's statement unless Petitioner takes the stand and contradicts the statements he made to the officers. Pet. Exh. 1, at 23-24; RT Vol. 1 at 29-30, ECF 21-7. Based on Prosecution's representation, the Trial Court offer tentatively deferred ruling on Petitioner's request for an Evidence Code section 402 hearing until the proffer of Petitioner's post-arrest statement. Pet. Exh. 1, at 24; RT Vo. 1 at 30, ECF 21-7. The court advised both counsel to "admonish" their witnesses regarding the court's *in limine* ruling. Pet. Exh. 1, at 24, RT Vol. 1 at 37, ECF 21-7.

At trial, Sergeant Gantt testified that he had interviewed Petitioner and read him his rights in response to Trial Counsel's questions. *See* Pet. 70–71. Petitioner asserts that Trial Counsel was ineffective for failing to object to Sergeant Gantt's testimony on constitutional grounds and for failing to request that the jury be admonished to disregard Sergeant Gantt's testimony. Pet. 72–73, 81. The State Appellate Court properly found that Petitioner was not prejudiced by Sergeant Gantt's testimony. Pet. Exh. 1, at 27. The State Appellate Court reviewed the evidence with respect to the ineffective counsel claim as follows:

> Because we find no prejudicial error in the admission of those portions of Sergeant Gantt's testimony challenged on appeal, we reject defendant's contention, made on direct appeal and in his petition for writ of habeas corpus, that his trial counsel was ineffective because she failed to appropriately object to the introduction of any evidence or arguments concerning defendant's interrogation,

the reading of his *Miranda* rights and his postarrest silence, or otherwise argue that Sergeant Gantt's testimony violated defendant's constitutional rights to due process, a fair trial, to remain silent and to equal protection under Article I of the California Constitution and the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution. (See *Strickland, supra*, 466 U.S. at p. 697 [claim of ineffective assistance of counsel may be resolved solely by "examining the prejudice suffered by the defendant as a result of the alleged deficiencies"].)

Pet. Exh. 1, at 27 n.26.

This Court agrees with the State Appellate Court that Petitioner was not prejudiced by Sergeant Gantt's testimony. While Sergeant Gantt alluded to interviewing Petitioner and *Mirandizing* him, Sergeant Gantt never testified that Petitioner invoked his *Miranda* rights. Pet. Exh. 1, at 27. Furthermore, during closing remarks the Prosecution mentioned neither Sergeant Gantt's testimony nor Petitioner's post-arrest silence. Pet. Exh. 1, at 27. Instead, the Prosecution mentioned only Petitioner's pre-arrest statements explaining how he was shot. Pet. Exh. 1, at 27. Therefore, it is unlikely that Trial Counsel's failure to object on constitutional grounds prejudiced the outcome. *See Strickland*, 466 U.S. at 697; *see also McKenna v. McDaniel*, 65 F.3d 1483, 1494 (9th Cir. 1995) (finding an ineffective counsel claim was unavailing because the alleged *Doyle* error upon which the claim was based was neither erroneous nor prejudicial); *Melendez*, 2013 WL 1662355, at *13 (finding no prejudice on an alleged *Doyle* error where the prosecutor highlighted other legitimate evidence pointing to the petitioner's guilt during closing remarks); *Nguyen v. Felker*, No. C 07-2479 MHP (pr), 2009 WL 1246693, at *12 (N.D. Cal. May 5, 2009) (finding no prejudice on an alleged *Doyle* error where there was no reasonable probability that a proper objection would have changed the outcome because the prosecutor focused on other evidence during closing remarks).

A "doubly" deferential judicial review of this claim shows that the State Appellate Court's rejection was not an unreasonable given the role of Sergeant Gantt's testimony at trial. *See Cullen*, 563 U.S. at 202; 28 U.S.C. § 2254(d). Thus, Petitioner cannot obtain habeas relief on this ground.

### 5.  Failure to Call a Defense Witness

In Claim 5, Petitioner asserts that "[t]rial counsel should have called Mr. Thompkins as a defense witness because he could have testified to facts establishing that petitioner acted in

defense of another and self-defense." Pet. 59. Specifically, Petitioner claims that Thompkins

could establish facts supporting that (1) the Victim, as the initial aggressor, brandished a firearm

and shot Petitioner first, (2) the situation was exigent, and (3) Thompkins did not encourage the

last shot. Pet. 59–60. The State Appellate Court reviewed the evidence as follows:

> In support of his argument that his trial counsel was ineffective, defendant asks us to consider parts of the record on appeal and certain documents annexed to his petition that were not part of the record on appeal. He specifically argues . . . his trial counsel should have . . . called Thompkins as a defense witness.
>
> Based on our review of the record as well as the additional documents submitted by defendant annexed to his petition for writ of habeas corpus, we find defendant has failed to make a prima facie showing for relief on the ground of ineffective assistance of trial counsel. Specifically, he has not demonstrated there is a reasonable probability that, but for his trial counsel's alleged unprofessional errors and/or omissions, the trial would have resulted in a more favorable outcome. (*Visciotti, supra,* 14 Cal.4th at p. 352.) Except for the claim that counsel should have called Thompkins as a defense witness, we have addressed defendant's claims on the direct appeal and concluded trial counsel's acts or omissions did not prejudice defendant. Regarding trial counsel's failure to call Thompkins as a defense witness, we accept, for the purpose of argument, that counsel had no "tactical reason" for not calling Thompkins as a defense witness. Nevertheless, in determining whether counsel's failure was prejudicial, we evaluate the entire record, not the single error in isolation. The testimony of Thompkins would have been materially helpful if he corroborated defendant's testimony that he fired a gun at the victim because he reasonably believed the victim was reaching for a second gun as he ran away or after he fell on the ground. However, we see nothing in the transcripts of Thompson's [sic] interviews with the police and the public defender, and, defendant points to nothing, that would have assisted the jury in resolving this dispositive issue—whether defendant knew, or reasonably could have known, the victim had a second gun. Thus, defendant has not shown it is reasonably probable that, had his trial counsel called Thompkins as a defense witness, the verdicts would have been different. (*Riel, supra,* 22 Cal.4th at p. 1175.) "[T]he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." (*Strickland, supra,* 466 U.S. at p. 686.) Contrary to defendant's arguments, the verdicts and sentences in this case were not "rendered unreliable by a breakdown of the adversary process caused by deficiencies in counsel's assistance." (*Id*. at p. 700.)

Pet. Exh. 1, at 50–51.

This Court agrees with the State Appellate Court that Petitioner has not demonstrated there

is a reasonable probability that, but for his Trial Counsel's alleged errors, the trial would have

resulted in a more favorable outcome. *See* Pet. Exh. 1, at 50. Even assuming Trial Counsel had

no "tactical reason" for not calling Thompkins as a defense witness (as the State Appellate Court

did), the State Appellate Court was not unreasonable in finding that Trial Counsel's failure to call

Thompkins was not prejudicial. This is because the State Appellate Court, correctly, considered the entire record and found nothing in the transcripts of Thompkins' interviews with the police and the public defender that would have led to jury to conclude that Petitioner knew or reasonably could have known that the Victim had a second gun. *See* Pet. Exh. 1, at 50-51. In other words, while Thompkins' testimony would have been materially helpful *if* he corroborated Petitioner's account (that he shot the Victim because he reasonably believed the Victim was reaching for a second gun as he ran away or after he fell on the ground), there is no basis on the record to demonstrate that Thompkins would have provided such testimony. *See* Pet. Exh. 1, at 50-51.

Accordingly, the State Appellate Court's rejection of this claim was not an unreasonable application of precedent or an unreasonable determination of the facts. *See Cullen*, 563 U.S. at 202; 28 U.S.C. § 2254(d). Thus, Petitioner is not entitled to habeas relief based on Trial Counsel's failure to call Thompkins as a defense witness.

### 6. Closing Statements

Petitioner also argues that Trial Counsel ineffectively handled the Prosecution's statements during closing rebuttal on constitutional grounds. Pet. 78, 81–82. The State Appellate Court reviewed the evidence as follows:

> Defendant argues, in his direct appeal and in his petition for writ of habeas corpus, that his trial counsel was ineffective for inadequately objecting to the challenged remarks, failing to request an admonition to some of the challenged remarks, and for failing to lodge an objection to other challenged remarks. However, "competent counsel may often choose to forgo even a valid objection. '[I]n the heat of a trial, defense counsel is best able to determine proper tactics in the light of the jury's apparent reaction to the proceedings. The choice of when to object is inherently a matter of trial tactics not ordinarily reviewable on appeal.' [Citation.]" (*Riel, supra,* 22 Cal.4th at p. 1197; see *United States v. Eaglin* (9th Cir. 1977) 571 F.2d 1069, 1087 [defense counsel's failure to object could be explained on the ground that counsel "could have legitimately thought that an objection would have served only to draw further attention to the damaging statement while clearly not erasing its effect from the jurors' minds"].) In all events, as we later explain in the text of this opinion, defendant's claim of ineffective assistance of counsel fails as we find no prejudicial error in the prosecutor's closing remarks. (See *Strickland, supra,* 466 U.S. at p. 697 [claim of ineffective assistance of counsel may be resolved solely by "examining the prejudice suffered by the defendant as a result of the alleged deficiencies"].)

Pet. Exh. 1, at 38 n.33.

This Court cannot find that the State Appellate Court was unreasonable in assessing

Petitioner's claims. Trial Counsel raised several objections during the Prosecution's closing rebuttal marks, prompting the Trial Court to remind the jury that the Prosecution's comments were not evidence. Pet. Exh. 1, at 36. Trial Counsel addressed the issue through objections and a motion for a new trial. Pet. Exh. 1, at 36 n.32. As the State Appellate Court noted, competent counsel may choose to forgo even a valid objection for tactical reasons. Pet. Exh. 1, at 38, n. 33 (citing *People v. Riel*, 22 Cal. 4th 1153, 1197 (2000)); *see also Mengarelli v. United States Marshal*, 476 F.2d 617, 619 (9th Cir. 1973) ("Where counsel otherwise perform in a fully competent manner, a choice of trial tactics, even though deemed unwise in retrospect, can rarely be said to rise to the level of a deprivation of a constitutional right."); *Strickland*, 466 U.S. at 689 ("Any [particular set of detailed rules for counsel's conduct] would interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions.").

More importantly, as already explained, the State Appellate Court was not unreasonable in finding that the Prosecution's challenged remarks did not warrant reversal. *See* Pet. Exh. 1, at 38; *see also Brecht*, 507 U.S. at 637–38; *Mares*, 940 F.2d at 461. The jury was already aware that Thompkins had not been called as a witness and the reasons why. Pet. Exh. 1, at 39–40. And the Trial Court's admonitions to the jury—both during the Prosecution's closing remarks and again in its closing instructions—cured any potential for harm. *See* Pet. Exh. 1, at 40. While one juror may have noticed Petitioner's failure to produce Thompkins as witness, Petitioner presented no evidence that the jury discussed this failure during deliberations. *See* Pet. Exh. 1, at 40 n.34; *Demirdjian v. Gipson*, 832 F.3d 1060, 1075 (9th Cir. 2016) (finding that statements to jurors by reporters about a defendant's silence were not evidence that jurors discussed the issue and that jury instructions mitigated any prejudice). In any event, the Federal Rules of Evidence preclude inquiry into the jurors' deliberations and mental processes. *See* Fed. R. Evid. 606(b); *see also Estrada*, 512 F.3d at 1237–38. Consequently, Trial Counsel's failure to object to such remarks on constitutional grounds was not prejudicial. *See Strickland*, 466 U.S. at 697.

Accordingly, after conducting a "doubly" deferential judicial review, this Court finds that the State Appellate Court's rejection of this claim was neither an unreasonable application of

Supreme Court precedent nor an unreasonable determination of the facts given the evidence. *See*

*Cullen*, 563 U.S. at 202; 28 U.S.C. § 2254(d).  Thus, Petitioner is not entitled to habeas relief

based on this claim.

### 7. Sentencing

Petitioner asserts that Trial Counsel did not adequately object to the Trial Court's

sentencing decisions.  Pet. 82.  Specifically, Petitioner claims that Trial Counsel should have

argued that consecutive sentences for the two charges were prohibited by Cal. Pen. Code § 654.

Pet. 82.  Additionally, Petitioner contends that Trial Counsel should have argued that the Trial

Court did not consider Petitioner's good behavior since his previous conviction, successful

completion of probation, and the unusual circumstances under which his crimes were committed.

Pet. 82.  The State Appellate Court reviewed the evidence as follows:

A. Relevant Facts

Before sentencing, the probation department filed a report with attached
sentencing memoranda written by the prosecution and defense counsel. The
probation department report indicated defendant, who was 34 years at the time of
the current offenses, was not eligible for probation because he sustained a 1993
juvenile adjudication based on the commission of an armed robbery at the age of
16, for which he was sent to juvenile camp. The report also noted defendant had
sustained the following additional juvenile adjudication and convictions: (1) 1994
juvenile adjudication for possession of drugs (committed to CYA for one year); (2)
1996 convictions, as an adult, for the felony offense of possession of cocaine for
sale (Health & Saf. Code, former § 11351.5) and the misdemeanor offense of
gaming (§ 330), for which he was granted probation, which was revoked and
reinstated several times, and ultimately terminated in 1999; (3) 2000 conviction, as
an adult, for the misdemeanor offense of attempt to evade a peace officer while
driving recklessly (Veh. Code, § 2800.2); and (4) 2002 conviction, as an adult, for
the felony offense of possession of cocaine for sale (Health & Saf. Code, former
§ 11351.5), for which he was again granted probation, which was revoked in 2006,
and ultimately terminated in 2008.

As to the current offenses, the probation department report listed several
circumstances in aggravation: (1) "The crime involved great violence and acts
disclosing a high degree of viciousness;" (2) "The defendant was armed with a
firearm at the time of the commission of the crime;" and (3) "The defendant's prior
convictions as an adult and sustained petitions in juvenile delinquency proceedings
are numerous or of increasing seriousness." (Cal. Rules of Court, [FN35] rule
4.421(a)(1), (2), (b)(2)). The report also listed several circumstances in mitigation:
(1) "The victim was an initiator of the incident;" (2) "The crime was committed
because of an unusual circumstance, which is unlikely to recur;" and (3) "The
defendant participated in the crime under circumstances of duress." (Rule
4.423(a)(2), (3), (4).) The probation department report also noted the following
criteria affected concurrent or consecutive sentences: (1) "The crimes and their
objectives were not predominantly independent of each other;" and (2) "The crimes

were not committed at different times or separate places, and were committed so closely in time and place as to indicate a single period of aberrant behavior." (Rule 4.425(a)(1), (3).) In the analysis portion of the report, the probation department officer stated that because there were mitigating and aggravating factors, the middle term for the voluntary manslaughter conviction appeared to be appropriate. The probation department officer also pointed out that concurrent sentences on the two substantive offenses would be appropriate because the offenses were committed close in time and place. The probation department report further noted defendant had provided a statement, expressing his remorse. [FN36]

> FN35. All further unspecified references to rules are to the California Rules of Court.

> FN36. In her sentencing letter to the probation department, defense counsel did not recommend specific sentences, but she asked that certain criteria and factors in mitigation be considered in forming any sentencing recommendations, including, in pertinent part, that defendant's "prior record is insignificant given the factual background of the present offense, the lack of any adult convictions involving violence or guns, and the age of his two adult prior drug convictions (1996 and 2002)," he had performed satisfactorily in the past on probation, and he had no prior prison commitments. (Rule 4.423 (b)(1), (6).)

At sentencing, the court struck the defendant's prior juvenile adjudication for second-degree robbery for the purposes of sentence. The court then noted that it had read the probation department report, counsels' sentencing memoranda, letters from various family members and friends, restitution reports, defendant's letter expressing a great deal of remorse, a letter from defendant's girlfriend, a victim impact statement from the victim's mother, and viewed photographs of the victim during his life. The court tentatively ruled it would impose an aggregate term of 21 years and 8 months, consisting of consecutive terms of 11 years (aggravated term) on the voluntary manslaughter conviction, 10 years (aggravated term) on the firearm-use sentence enhancement, and 8 months (one-third of the middle term) on the possession of a firearm by a felon conviction.

The court then considered in-court statements made by the victim's mother, the victim's uncle, and defendant, and counsel's arguments addressing the tentative sentence. In pertinent part, defense counsel urged the court to reconsider its decision, arguing it failed to consider several mitigating factors concerning the unusual circumstances of the shooting. In response to the court's query as to whether counsel was recommending a consecutive term be imposed on the conviction for possession of a firearm by a felon, defense counsel argued, that "given the proximity of events," the court should impose a concurrent term of one-third of the middle term on that conviction. Based on the court's decision to strike defendant's prior juvenile adjudication for the purposes of sentence, the prosecutor argued for an aggregate term of 16 years, but submitted the matter to the court's discretion.

After taking "into strong consideration all arguments of counsel and all new evidence" received at sentencing, the court revised its tentative ruling and imposed an aggregate term of 15 years and 8 months, consisting of consecutive terms of 11 years (aggravated term) on the voluntary manslaughter conviction, 4 years (middle term) on the firearm-use sentence enhancement, and 8 months (one-third of the middle term) on the possession of a firearm by a felon conviction. In so ruling, the court commented as follows: "This case was troubling for so many reasons. And it all appeared that if someone had just arrived at that driveway a little later or a little

sooner, maybe nothing would have happened—all of this over disrespect, over mean-mugging, over feeling that you have to protect other individuals, over intoxication, and then the bravado of having another friend who then all of a sudden is missing in action when it really counts, who persuades you to take one more step, if we are to believe the comment that was contained during the pretrial hearing in this matter. [¶] It is still my position, as it relates to count one [voluntary manslaughter], that the ... aggravated term, is appropriate for eleven years due to the gratuitous shot at the end; the level of intoxication; the consciousness of guilt by leaving the scene; contriving a story that didn't support the facts or the circumstances; and [defendant]'s history that in some ways was mitigating for the purposes of striking a ... prior, which could have increased this penalty two-fold. [¶] Conversely, [defendant's] version on the witness stand rang true when, subsequent to his leaving the incident, the gun was found beneath the victim. And [defendant] could not have contrived that story had he had not felt something when he placed the victim in a bear hug. That may have clearly contributed to some of his actions absent that last fatal shot, or that last gratuitous shot, depending upon the point of view of either advocate. [¶] The midterm clearly is warranted as it relates to the enhancement."

B. Analysis

Defendant argues section 654 prohibited the trial court from imposing separate terms on the convictions for voluntary manslaughter and possession of a firearm by a felon. [FN37] We disagree.

> FN37. Although defense counsel did not address at the sentencing hearing section 654's applicability, in her sentencing memorandum she appropriately asked the court to evaluate, first, whether section 654 was applicable, and then, to consider imposing a concurrent term, instead of a consecutive term, on the possession of a firearm by a felon conviction (count two). (Rule 4.424.) In all events, "[e]rrors in the applicability of section 654 are corrected on appeal regardless of whether the point was raised by objection in the trial court or assigned as error on appeal." (*People v. Perez* (1979) 23 Cal.3d 545, 549-550, fn. 3; *People v. Scott* (1994) 9 Cal.4th 331, 354, fn. 17 (*Scott*) [accord].)

"Before determining whether to impose either concurrent or consecutive sentences on all counts on which the defendant was convicted, the court must determine whether the proscription of section 654 against multiple punishments for the same act or omission requires a stay of execution of the sentence imposed on some of the counts." (Rule 4.424; see *People v. Reed* (2006) 38 Cal.4th 1224, 1227.) [FN38] "In the absence of any reference to Penal Code section 654 during sentencing, the fact that the court did not stay the sentence on any count is generally deemed to reflect an implicit determination that each crime had a separate objective." (*People v. Tarris* (2009) 180 Cal.App.4th 612, 626.) The trial court's finding will not be reversed on appeal if there is any substantial evidence to support it. (*People v. Blake* (1998) 68 Cal.App.4th 509, 512.)

> FN38. Accordingly, we reject defendant's argument that if section 654 applied in this case the court should have imposed a concurrent sentence on the conviction for possession of a firearm by a felon. As noted in the text of the opinion, if section 654 applied, the sentence imposed on that conviction would be imposed and then its execution would be stayed.

"[S]ection 654 'literally applies only where [multiple] punishment arises out of multiple statutory violations produced by the "same act or omission." '

[Citation.] But decisions interpreting section 654 have extended its protection 'to cases in which there are several offenses committed during "a course of conduct deemed to be indivisible in time." [Citation.]' [Citations.]" (*People v. Hicks* (1993) 6 Cal.4th 784, 791.) "It is defendant's intent and objective, not the temporal proximity of his offenses, which determine whether the transaction is indivisible. [Citations.]" (*People v. Harrison* (1989) 48 Cal.3d 321, 335.) Pertinent to our discussion, " '[w]hether a violation of [section 29800, subd. (a)(1) ], forbidding [a] person[ ] convicted of felonies from possessing firearms ..., constitutes a divisible transaction from the offense in which he employs the firearm depends upon the facts and evidence of each individual case.' " (*People v. Bradford* (1976) 17 Cal.3d 8, 22; see, e.g., *Ibid.* [prosecution conceded applying section 654 where defendant assaulted police officer with officer's weapon and retained weapon only until arrested after police chase immediately following assault]; *People v. Venegas* (1970) 10 Cal.App.3d 814, 821 [applying section 654 where "the evidence shows a possession [of the firearm] only at the time defendant shot [the victim]; *People v. Killman* (1975) 51 Cal.App.3d 951, 959 [rejecting application of section 654 where defendant convicted of first degree robbery as accomplice to armed robber, and possession of firearm by felon for his own personal possession of gun before the robbery].)

As we have stated previously, not unlike the jury, the trial court here could reasonably find defendant's possession of the firearm after the shooting "was indisputably an act separate in time from the [shooting] and thus justified separate convictions and separate punishments." (*People v. Alvarado* (1982) 133 Cal.App.3d 1003, 1029; see *People v. Garcia* (2008) 167 Cal.App.4th 1550, 1565, 1566 [trial court had discretion to impose concurrent sentences for firearm possession by a felon and second-degree robbery committed with the same firearm; "implicit in the trial court's concurrent sentencing order is the implied finding that defendant's intent in possessing the firearm during the Arcadia robberies was different from that when he was stopped in El Monte and he contemplated the shootout with the arresting officers"]; cf. *People v. Atencio* (2012) 208 Cal.App.4th 1239, 1244 ["defendant's theft of the pistol was merely the means by which he gained possession of the pistol;" "[u]nder these facts, without more, there was no substantial evidence to support the trial court's double punishment of defendant for taking the pistol and subsequently possessing it" as a felon].) Accordingly, on this record, because substantial evidence supports the court's implicit finding that section 654 did not apply, we must uphold its imposition of a term of imprisonment on the conviction for possession of a firearm by a felon.

Defendant also argues that the trial court abused its discretion in aggravating his sentence and imposing consecutive terms. He claims the factors cited in support of such choices were inapplicable, duplicative, and improperly weighed. However, as defendant correctly concedes, he has forfeited his claims of error because he failed to object on these grounds in the trial court. (*Scott, supra*, 9 Cal.4th at p. 356 ["complaints about the manner in which the trial court exercises its sentencing discretion and articulates its supporting reasons cannot be raised for the first time on appeal"].) Nonetheless, as we now discuss, the claims of error are without merit, and, in all events, do not require remand for resentencing.

Contrary to defendant's contention, the trial court's failure to mention specific mitigating factors when issuing its sentences does not mean the court did not consider those factors. "While the trial court was obliged to consider the factors in aggravation as well as mitigation prior to sentencing [citation], it was not required to set out its reasons for rejecting mitigating factors. [Citations.]" (*People v. Jones* (1985) 164 Cal.App.3d 1173, 1181.) "Absent an explicit statement by the trial court to the contrary, it is presumed the court properly exercised its legal duty

to consider all possible mitigating and aggravating factors in determining the appropriate sentence. [Citation.]" (*People v. Oberreuter* (1988) 204 Cal.App.3d 884, 888.) The trial court here was also permitted to consider the fact that it had stricken defendant's prior juvenile adjudication for the purposes of sentence. (See *People v. Garcia* (1999) 20 Cal.4th 490, 500 [trial court may properly exercise its discretion to avoid imposing an unjust sentence by striking prior conviction allegations with respect to some, but not all counts, even if current offenses do not differ from one another]; see Rule 4.420(b) ["[i]n exercising his or her discretion in selecting one of the three authorized prison terms referred to in section 1170(b), the sentencing judge may consider circumstances in aggravation or mitigation, and any other factor reasonably related to the sentencing decision"].)

We also see no merit to defendant's contention that the trial court was prohibited by rule 4.425 from imposing a consecutive term on the conviction for possession of a firearm by a felon, having imposed a term of imprisonment on the firearm-use sentence enhancement. Rule 4.425(b) reads: "Any circumstances in aggravation or mitigation may be considered in deciding whether to impose consecutive rather than concurrent sentences, except: (1) A fact used to impose the upper term; (2) A fact used to otherwise enhance the defendant's prison sentence; and (3) A fact that is an element of the crime may not be used to impose consecutive sentences." Here, the trial court could reasonably impose a term of imprisonment on the firearm-use sentence enhancement based on defendant's personal use of the firearm during the shooting and a consecutive sentence for defendant's possession of a firearm by a felon based on his subsequent and continued possession of the firearm after the shooting, without the intent to relinquish or arrange for the firearm's proper disposal or destruction. Even assuming the trial court committed error as argued by defendant, given the other aggravating factors mention by the court, we are confident that if we remanded the matter for resentencing, the court would impose the same consecutive term without relying on the purported use of the same aggravating factor. (See *People v. Osband* (1996) 13 Cal.4th 622, 732; *Id.* at pp. 728-729 ["[o]nly a single aggravating factor is required to impose the upper term ..., and the same is true of the choice to impose a consecutive sentence"].) [FN39]

> FN39. Because we find no prejudicial error in the court's sentencing decisions, we reject defendant's arguments, made on his direct appeal and in his petition for writ of habeas corpus, that his trial counsel was ineffective for failing to (1) specifically mention at the sentencing hearing his "good behavior since his last conviction [and] successful completion of probation," (2) object to the court's purported dual use of sentencing factors, (3) argue that the court's errors violated defendant's rights to due process, freedom from cruel and unusual punishment and equal protection under Article I of the California Constitution and the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution; and (4) submit letters from defendant's family members regarding his sentence. (See *Strickland, supra*, 466 U.S. at p. 697 [claim of ineffective assistance of counsel may be resolved solely by "examining the prejudice suffered by the defendant as a result of the alleged deficiencies"].)

Pet. Exh. 1, at 41–48.

Here, this Court finds no merit in Petitioner's contentions that Trial Counsel provided

ineffective assistance through her failure to object to the Trial Court's sentencing. To start, the

Supreme Court has repeatedly held that federal habeas relief is unavailable for alleged errors of state law. *See Swarthout v. Cooke*, 562 U.S. 216, 219 (2011); *accord Estelle*, 502 U.S. at 67–68. Hence, to the extent that Petitioner disagrees with the State Appellate Court's characterization of the evidence as it applies to § 654, there is no basis for federal habeas relief.

Furthermore, Trial Counsel's performance cannot be deemed deficient for failing to argue that § 654 does not permit consecutive charges in this context because § 654 makes no such prohibition. *See Juan H. v. Allen*, 408 F.3d 1262, 1273 (9th Cir. 2005) (finding that counsel's performance was not deficient for failing to raise an objection that would have been properly overruled). Under § 654, "[a]n act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment." Cal. Pen. Code § 654(a). As the State Appellate Court explained, the Trial Court could have reasonably found that Petitioner's possession of the firearm after the shooting was a distinct act from the shooting itself, especially given that Petitioner kept the gun after the shooting and showed no intent to relinquish the gun or arrange for its proper disposal or destruction. Pet. Exh. 1, at 46–48. And even if an objection to consecutive sentences had been warranted, Trial Counsel did raise the issue. *See* Pet. Exh. 1, at 43. Not only did the Trial Counsel highlight the proximity of the events for each charge at the hearing, but her sentencing memorandum also asked the Trial Court to consider whether § 654 was applicable and to impose a concurrent term regardless. Pet. Exh. 1, at 43, 44 n.37.

Finally, this Court disagrees with Petitioner's contention that "[g]iven the trial court's broad discretion, trial counsel's failure to raise the 654 issue at sentencing is very likely to have prejudiced petitioner." Trav. 26. Trial Counsel offered the mitigating evidence at issue; the Trial Court simply did not explicitly cite this evidence to support its reasons for the sentence. Pet. Exh. 1, at 47. That said, the Trial Court was aware of mitigating circumstances such as the unusual circumstances under which the crime was committed. Pet. Exh. 1, at 42. Trial Counsel highlighted this evidence and urged the Trial Court to reconsider its tentative sentence of 21 years and 8 months based on unusual circumstances. Pet. Exh. 1, at 42 n.36, 43. And in support of its sentencing decision, the Trial Court explained that finding the second gun on the Victim "may

have clearly contributed to some of [Petitioner's] actions absent that last fatal shot . . . . The mid-term is clearly is warranted as it relates to the enhancement." Pet. Exh. 1, at 44.

The State Appellate Court was not unreasonable in finding no prejudicial error during the sentencing or in finding no prejudice with respect to Trial Counsel's alleged ineffective assistance. *See* Pet. Exh. 1, at 48 n.39. Accordingly, after conducting a "doubly" deferential judicial review, this Court finds that the State Appellate Court's rejection of this claim was not unreasonable. *See Cullen*, 563 U.S. at 202; 28 U.S.C. § 2254(d). Thus, Petitioner is not entitled to habeas relief on his claims for ineffective counsel during sentencing.

### 8. Summary of Ineffective Counsel Claims

This Court disagrees with Petitioner that "[a] result more favorable to petitioner would have occurred at trial if counsel had fully objected to the errors and misconduct and sought appropriate jury instructions." Pet. 83. For each ineffective counsel claim, the State Appellate Court found that Trial Counsel's actions did not prejudice the outcome at trial. Pet. Exh. 1, at 50. In no instance did the State Appellate Court unreasonably apply *Strickland* or the facts on record when evaluating these claims. *See Cullen*, 563 U.S. at 202; 28 U.S.C. § 2254(d). Thus, Petitioner's request for habeas relief as to all claims for ineffective counsel is DENIED.

### G. Cumulative Error (Claim 12)

Petitioner separately claims that even if the foregoing individual errors are not sufficiently prejudicial to warrant a new trial, the cumulative effect of those errors does. Pet. 83. The State Appellate Court rejected this claim:

> Lastly, we conclude defendant has failed to make a prima facie showing demonstrating that the cumulative effect of the prosecutor's late disclosure of the U-Visa applications, and the individual claims of ineffective assistance of trial counsel alleged in the petition, would warrant granting the petition. As we have recognized, "[u]nder the 'cumulative error' doctrine, errors that are individually harmless may nevertheless have a cumulative effect that is prejudicial." (*Avena, supra,* 12 Cal.4th at p. 772, fn. 32.) Any purported errors, considered individually or collectively, were not so prejudicial as to deny defendant a fair trial or reliable verdicts and sentences.

Pet. Exh. 1, at 51.

"'[P]rejudice may result from the cumulative impact of multiple deficiencies.'" *Harris v. Wood*, 64 F.3d 1432, 1438 (9th Cir. 1995) (quoting *Cooper v. Fitzharris*, 586 F.2d 1325, 1333

(9th Cir. 1978) (en banc), *cert. denied*, 440 U.S. 974 (1979)). To succeed on a claim for cumulative error, the trial must have been "fundamentally unfair" because "the errors rendered the criminal defense 'far less persuasive.'" *Parle v. Runnels*, 505 F.3d 922, 928 (9th Cir. 2007). Furthermore, where no single constitutional error exists, the errors cannot accumulate to the level of a constitutional violation. *See Hayes v. Ayers*, 632 F.3d 500, 524 (9th Cir. 2011); *Mancuso v. Olivarez*, 292 F.3d 939, 957 (9th Cir. 2002), *overruled on other grounds by United States v. Chandler*, 658 F. App'x. 841 (9th Cir. 2016); *Fuller v. Roe*, 182 F.3d 699, 704 (9th Cir. 1999) *overruled on other grounds by Williams v. Filson*, 908 F.3d 546 (9th Cir. 2018); *Rupe v. Wood*, 93 F.3d 1434, 1445 (9th Cir. 1996).

The State Appellate Court's rejection of cumulative error here was not unreasonable. While Petitioner's trial was not perfect, the State Appellate Court reasonably found that those errors lacked prejudicial effect. Pet. Exh. 1, at 51. The resulting trial was not fundamentally unfair. *See Parle*, 505 F.3d at 928. Petitioner has failed to show cumulative prejudice to warrant federal habeas relief. *See Hayes*, 632 F.3d at 524. Accordingly, the State Appellate Court's rejection of this claim was not an unreasonable application of Supreme Court precedent or based on an unreasonable determination of the facts given the evidence presented. 28 U.S.C. § 2254(d). Thus, Petitioner's request for habeas relief as to Claim 12 for cumulative error is DENIED.

## V. REQUEST FOR EVIDENTIARY HEARING & DISCOVERY

Petitioner seeks an evidentiary hearing and leave to engage in further discovery, primarily to develop his ineffective counsel claims. *See generally* Req. for an Evid. Hr'g or, in the Alternative, Disc. ("Request" or "Req."), ECF 28. Specifically, Petitioner aims to determine whether Trial Counsel made a tactical decision (1) to limit use of U-Visa evidence (Claim 4), (2) not to call Fred Thompkins as a witness (Claim 5), and (3) not to object to the Prosecution's rebuttal comments on constitutional grounds (Claim 10). Req. 4–6. For these claims, Petitioner seeks to depose Trial Counsel, a *Strickland* expert, the three workers, and Thompkins. Req. 4–5. For Claim 10, Petitioner also seeks to depose jurors to determine whether Petitioner was prejudiced by the Prosecution's rebuttal comments. Req. 5–6. Finally, for Claim 11 Petitioner seeks to depose a *Strickland* expert to determine whether Defense Counsel should have requested

that the Trial Court apply § 654 at sentencing. Req. 6. Because Petitioner's arguments as to Claims 4, 5, 10, and 11 are unavailing under AEDPA, his request for an evidentiary hearing is DENIED.

### A. Evidentiary Hearing

Petitioner asserts that an evidentiary hearing is mandatory as to Claims 4, 5, 10, and 11, or alternatively that this Court should exercise its discretion to hold an evidentiary hearing on those claims. Req. 3. AEDPA standards aim to prevent federal courts from re-trying state proceedings through habeas petitions. *See Cullen*, 563 U.S. at 186. Under AEDPA, § 2254(d) governs the standards for granting relief, while § 2254(e) governs the standards for granting an evidentiary hearing. To obtain an evidentiary hearing and present evidence for the first time in federal court, a petitioner must first satisfy § 2254(d). *See Pinholster*, 563 U.S. at 183; *Hurles v. Ryan*, 752 F.3d 768, 778 (9th Cir. 2014). This is because the Supreme Court has held that federal habeas review under 28 U.S.C. § 2254(d)(1) "is limited to the record that was before the state court that adjudicated the claim on the merits" and "that evidence introduced in federal court has no bearing on" such review. *Cullen*, 563 U.S. at 182–83; *see also Sully v. Ayers*, 725 F.3d 1057, 1075 (9th Cir. 2013) ("[A]n evidentiary hearing is pointless once the district court has determined that § 2254(d) precludes habeas relief.).

Here, this case was already adjudicated on the merits in state court. As already explained, the State Appellate Court applied the correct governing Supreme Court precedent to all ineffective counsel claims and did not unreasonably apply precedent to the facts of this action. *See* 28 U.S.C. § 2254(d); *Pinholster*, 563 U.S. at 182, 85. Specifically, for the reasons described above, the facts alleged to support these claims, even if established at an evidentiary hearing, would not entitle Petitioner to federal habeas relief because Petitioner has failed to show prejudice. And Petitioner has not identified any concrete and material factual conflict that would require the Court to hold an evidentiary hearing to resolve. *See* 28 U.S.C. § 2254(d)(2); *Earp v. Ornoski*, 431 F.3d 1158, 1166–67 (9th Cir. 2005).

Additionally, as to whether the Prosecution's rebuttal comments prejudiced the jury, the Federal Rules of Evidence preclude jurors' testimony "about any statement made or incident that

occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict or indictment." Fed. R. Evid. 606(b); *see also Estrada*, 512 F.3d at 1237–38. Petitioner does not present any valid reasons for deposing jurors. *See* Pet. 74–75, 77; Req. 5–6. Because Petitioner's arguments are unavailing under § 2254(d), Petitioner's request for an evidentiary hearing as to those claims is not warranted. *See Sully v. Ayers*, 725 F.3d 1057, 1075 (9th Cir. 2013) (citing *Cullen*, 563 U.S. at 203 n.20).

Accordingly, an evidentiary hearing is neither required nor warranted. *See* 28 U.S.C. § 2254(e). Thus, Petitioner's request for an evidentiary hearing is DENIED.

### B. Discovery

Alternatively, Petitioner requests leave to conduct discovery that he claims could produce new evidence sufficient to warrant an evidentiary hearing. Req. 6–7. He seeks to depose Trial Counsel, a *Strickland* expert, Fred Thompkins, jurors, and the three workers. Req. 7. Rule 6 of the Federal Rules Governing § 2254 does allow a habeas petitioner to open up discovery pursuant to the Federal Rules of Civil Procedure if the Court grants leave to do so. But "[a] habeas petitioner . . . is not entitled to discovery as a matter of ordinary course." *Bracy v. Gramley*, 520 U.S. 899, 904 (1997). The Court may grant leave for discovery "in the exercise of [its] discretion and for *good cause* shown." *Id.* (emphasis added). Good cause exists "where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief." *Id.* at 908–09. As discussed above, Petitioner has failed to show good cause for new discovery because he has failed to demonstrate prejudice. *See, e.g., Jones v. Wood*, 114 F.3d 1002, 1009 (9th Cir. 1997) (reversing a district court's refusal to grant discovery where the court based its decision on an incomplete state record and where petitioner sought to obtain new DNA evidence); *see also Bracy*, 520 U.S. at 904, 908–09 (finding good cause where the petitioner offered new evidence that his trial attorney took bribes). Accordingly, Petitioner's request for discovery is also DENIED.

## VI.    CONCLUSION

After a careful review of the record and pertinent law, the Court concludes that the Petition for a Writ of Habeas Corpus must be DENIED.

73

Further, a Certificate of Appealability is DENIED. *See* Rule 11(a) of the Rules Governing Section 2254 Cases. Petitioner has not made "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). Nor has Petitioner demonstrated that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Petitioner may not appeal the denial of a Certificate of Appealability in this Court but may seek a certificate from the Court of Appeals under Rule 22 of the Federal Rules of Appellate Procedure. *See* Rule 11(a) of the Rules Governing Section 2254 Cases.

The Clerk shall terminate any pending motions, enter judgment in favor of Respondent, and close the file.

**IT IS SO ORDERED.**

Dated: March 3, 2020

_____
BETH LABSON FREEMAN
United States District Judge